1
2
3
4
5
6          UNITED STATES DISTRICT COURT
7          EASTERN DISTRICT OF CALIFORNIA

8

9  UNITED STATES OF AMERICA,      )      1:06-cv-1368 OWW TAG
                                  )
10              Plaintiff,         )      FINDINGS OF FACT AND
                                  )      CONCLUSIONS OF LAW AFTER
11     v.                         )      HEARING ON MOTION FOR
                                  )      PRELIMINARY INJUNCTION
12  LOWELL BAISDEN,               )
                                  )
13              Defendant.         )
                                  )
14  _____)

15

16      Plaintiff, United States of America's, Motion for

17  Preliminary Injunction was heard on March 2, 2007, at 10:00 a.m.

18  and March 6, 2007, at 9:00 a.m. in Courtroom 3 before the

19  Honorable Oliver W. Wanger.  During these proceedings, the

20  Plaintiff was represented by attorney Jacqueline Brown with the

21  United States Department of Justice.  The Defendants were

22  represented by attorneys Arthur Pearson with the firm of Murphy,

23  Pearson, Bradley & Feeney in San Francisco, California and

24  Marshall C. Whitney and Jerry D. Casheros of McCormick, Barstow,

25  Sheppard, Wayte & Carruth in Fresno, California.  The Court makes

26  the following Findings of Fact and Conclusions of Law in support

27  of the order of preliminary injunction entered on March 16, 2007.

28  (Doc. 73.)

1

### FINDINGS OF FACT

1.    Lloyd Baisden ("Baisden") has been a Certified Public Accountant licensed in California and Utah since 1978.

2.    Baisden is a solo practitioner in Bakersfield, California.

3.    Baisden acts as an income tax return preparer for clients in California and Nebraska.

4.    Baisden was the paid accountant and tax preparer for the following customers: Michael and Deanna Trierweiler for the tax years 2002 through 2004, Walter and Deborah Weaver for 2003, Michael and Susan Koning for 1999 through 2002, Donald and Kathryn Snoozy for 2002 and 2005, Evan and Jane Geilenkirchen for 2002, Larry and Vicki Hastings for 2002, Joel and Deborah Cooper for 1995 through 2004, Joseph and Rhonda Ghyselinck for 2002, Anthony and Kimberly Telese for 2002 through 2004, Burt and Pamela McKeag for 2002, John and June Sherley for 2002, Sue Brittian for 2003, Daniel Swartz and Jennifer Erale for 2002 through 2004.  (Exs. 5K-5M, 5P, 13A-13E, 5B, 5E, 2E, 6B, 14A, 14F, 14C-14D, 1B, 6D, 6F, Ex. 14 at ¶¶ 2, 24, and Doc. 22 at ¶ 3.)

5.    Baisden also acted as the paid accountant and prepared federal tax returns for Anesthesia Consultants of Nebraska, Inc., a Nebraska corporation; Bioventures, Inc.; Oceana Blue Corporation; Amethyst Sands, Inc.; Charpup Corporation; PTCW Corporation; Red Desert Resources Corporation; and Axhandle Corporation of Nevada.  In addition, Baisden was the accountant and paid tax preparer for Joel N. Cooper Physical Therapist, Inc.; Anthony Telese Company, Inc.; and Chuck's Automotive of

1    California.   (Exs. 1A, 2D, 5A, 5D, 5I, 5J, 5O, 5S, 6A, 14B, 14E.)

2        6.   Baisden also worked with the Arcturus Corporation,

3    which was incorporated in Nevada in 2002.   Michael Koning is

4    listed in the Nevada Secretary of State records as the President

5    and Treasurer of Arcturus, and Susan Baisden-Koning, Baisden's

6    sister, is listed as the Secretary.   Michael Koning is Susan's

7    husband.   Lowell Baisden is listed as a source of contact for

8    Arcturus in an advertisement posted on the Arcturus website.

9    (Exs. 7, 8.)

10       7.   Bioventures was incorporated in 1999 in Nevada.

11   Michael Koning is listed in the Nevada Secretary of State records

12   as the President and Secretary of Bioventures, and Susan Baisden-

13   Koning is listed as the Treasurer.   (Ex. 8.)

14       8.   Oceana Blue, Amethyst Sands, Charpup, and Red Desert

15   were incorporated in Nevada in 2002.   PTCW and Axhandle were

16   incorporated in Nevada in 2003.   For each corporation, Deborah

17   Fields of Las Vegas is listed by the Nevada Secretary of State as

18   the President, Secretary, and Treasurer for the corporations.

19   (Ex. 8.)

20       9.   Baisden has entered an appearance as a Power of

21   Attorney in the IRS civil audits/examinations for all of the

22   customers for whom he prepared federal income tax returns, as

23   listed above.

24       10.   Baisden is the registered agent and president of the

25   Gravity Corporation, Cranberry Place Corporation, and Pendant

26   Corporation of Wyoming, in which the Trierweilers and Weavers

27   have an interest.

28

3

**BAISDEN'S TAX METHODS**

11.   Baisden prepared and submitted a document entitled "Brief of Model" to the IRS which he said explains his tax methods.  Baisden's model has four parts: 1) tax mitigation; 2) business activity; 3) saving cash after tax; 4) tax mitigation as it relates to income.  *See* Ex. 29.

12.   Under the "tax mitigation" aspect of Baisden's plan, Baisden states that customers can reduce their income tax liability by reporting deductions related to a "business activity" other than the [professional] practice."  (Ex. 29.)

13.   Under the 'business activity" aspect of Baisden's plan, customers engage in a real estate investment such as improving an unimproved lot, "rather than...run[ning] another business." Baisden states that the business activity results in tax savings, which is reflected as equity in real estate.  (Ex. 29.)

14.   Under the "saving cash after tax" aspect of Baisden's plan, Baisden advises customers that "[y]ou can save as much as $120,000 after tax each year at these low rates."  Baisden advises that customers use the money they save in taxes to invest or otherwise save the money in lieu of a pension plan.  *See* Ex. 29.

15.   Under the final element of Baisden's plan, "tax mitigation as it relates to income," a customer's corporation purchases the customer's stream of employment income.  Baisden states that the purchase of the stream of income will then be taxed to the customer at the lower capital gains rates rather than the high ordinary rates as payments received for the sale of an asset.  (Ex. 29.)

**4**

16.   Baisden's model does not include any statement regarding benefits to customers such as asset protection or limiting professional liability.  Baisden's model does not describe any benefit to the customer from the real estate investment other than tax savings.

17.   Baisden incorporated various elements of the above plan in the tax returns he prepared for the customers listed above. *See supra* at ¶ 2.  Baisden paid Dr. Koning a fee for referring customers to him.  (Doc. 22, Baisden Decl. at ¶ 9 and Ex. 1 at ¶ 21.)  Baisden advocated the use of his tax methods to at least nine persons (not including their spouses) who worked with Dr. Koning at the Great Plains Regional Medical Center in North Platte, Nebraska, not including corporations for whom Baisden also acted as the account and tax preparer.

18.   Baisden charged his customers an initial fee for the corporations he assisted them to create, and a monthly fee for his accounting and tax preparation services.  (Exs. 1C, 4 at ¶ 10, 3 at ¶ 14, 9 at ¶ 9.)  Baisden also charged at least one customer for reimbursement for his travel expenses to Nebraska. (Ex. 9 at ¶ 9.)  According to his own calculations, for the year 2002, Baisden received 78% of his income from the customers listed above.  *See* Ex. 6J.

19.   Baisden states that he never tells his customers how much they will save in taxes by using his methods.  Doc. 22 at ¶ 21.)  Baisden told the Geilenkirchens they would pay approximately $10,000 each year in tax using his methods, rather than the $40,000 they had paid in previous years.  (Ex. 9 at ¶ 17.)  Baisden told Shane Kryzsko that by using his methods,

1  Kryzsko would save between $20,000 and $25,000 in taxes each

2  year.  (Ex. 3 at ¶ 13.)  Baisden told Dr. Bianco that he could

3  save approximately $7,500 in tax each month using Baisden's tax

4  methods.  (Ex. 4 at ¶ 10.)

5       20.  Baisden states that his customers do save taxes using

6  his methods.  (Doc. 36 at Exs. B and C.)

7       21.  In 2004, the IRS opened an examination to determine

8  whether Baisden was subject to penalty under I.R.C. §§ 6700,

9  6701, and 6694, or subject to an injunction under I.R.C. §§ 7402,

10 7407, and 7408 in 2004.  In October 2004, the IRS had a meeting

11 with Baisden in which Baisden explained his tax methods and tax

12 return preparation.  At the meeting, the IRS agent and IRS

13 counsel notified Baisden that they needed to investigate the

14 validity of his tax methods further, but they had some problems

15 with Baisden's methods as he described them.

16      22.  In subsequent conversations with Baisden, the IRS

17 confirmed that a § 6700 investigation was ongoing and that the

18 IRS had identified problems with Baisden's alleged scheme

19 regarding the compensation reported to the officers/service

20 providers of Baisden's customers' corporations.  Baisden later

21 told two other IRS agents that the investigation was concluded in

22 his favor and that there were no problems with his tax methods.

23 (Meyer Decl. ¶¶ 9-10, Ex. 11 at ¶¶ 8, 10, 12, 13, and 15 and

24 Cheung Testimony.)

25      23.  Baisden declares that several IRS agents in California

26 informed him that his tax practice was not abusive and that a

27 manager in California had requested that an IRS agent stop

28 auditing Baisden's customers.  (Doc. 22 at ¶¶ 37, 41.)  Neither

1 the IRS agent nor his manager made any such statements.

2 (Chynoweth and Cheung testimony.)

3     24. On March 8, 2007, following the two-day hearing on the

4 preliminary injunction motion during which the Court stated that

5 it would issue a partial injunction, Baisden sent an e-mail to a

6 former customer, Jane Geilenkirchen, in which he stated "[t]he

7 result is that the Government did NOT get an injunction. This

8 implies that your audit would have been resolved in your favor if

9 you had only waited patiently." (Ex. 33.)

10     25. The IRS has not endorsed or affirmed Baisden's tax

11 methods or tax return preparation, as described herein. The IRS

12 has made determinations of deficiencies on tax returns Baisden

13 prepared, or otherwise accepted amended returns, for the Hastings

14 for 2002, the Geilenkirchens for 2002, the McKeags for 2002, and

15 the Shyselincks for 2002. (Ex. 2F, 5H, 1D, and Ex. 15 at ¶ 8.)

16 The IRS has also determined that the following of Baisden's

17 customers have deficiencies in taxes reported, but the customers

18 have appealed the determinations: the Coopers for 2002, the

19 Teleses 2002 and 2003, and the Swartzes for 2002 through 2004.

20 (Ex. 6 at ¶¶ 14-15, 21, Ex. 14 at ¶ 22 and Chynoweth Testimony.)

21 These returns and the amount of taxes due, if any, from each

22 taxpayer, is a matter of dispute. At least two taxpayers have

23 admitted they owe additional taxes.

24

25                 __BAISDEN'S TAX RETURN PREPARATION__

26     26. From 1999 through 2004 Baisden was the accountant for

27 Anesthesia Consultants of Nebraska (ACN), a corporation co-owned

28 and operated by his brother-in-law, Dr. Michael Koning, in North

1  Platte, Nebraska.

2      27.  Dr. Koning received income in the amounts of $634,557,
3  $945,500, and $893,234 for the years 1999 through 2001.  (Exs. 2A
4  and 13A, 2B, 2C.)

5      28.  Baisden's customers Kathryn Snoozy, Evan Geilenkirchen,
6  and Shane Kryzsko worked as nurse anesthetists for ACN from 2001
7  through 2004.  Baisden's customers Deborah and Walter Weaver,
8  Michael Trierweiler, Chris Johng, Burt McKeag, and Michael Bianco
9  are physicians who also work at the Great Plains Regional Medical
10 Center in North Platte, Nebraska.  Williams Testimony.  (Ex. 1 at
11 ¶ 12, 2 at ¶ 17, Ex. 3 at ¶ 1, Ex. 4 at ¶ 1, Ex. 5 at ¶¶ 3, 43.)

12     29.  In 1999, 2000, 2001, and 2002, Baisden prepared federal
13 tax returns for Bioventures Corporation on which he reported that
14 Dr. Koning's income from ACN was assigned to Bioventures.
15 Baisden did not report any gross receipts to Bioventures other
16 than Koning's compensation from ACN.  (Exs. 2A, 2B, and 2C.)

17     30.  After Baisden failed for several months to produce a
18 Joint Venture Agreement to the IRS, Baisden gave the IRS a copy
19 of a purported Joint Venture Agreement between Bioventures and
20 the Konings.  The purported Agreement, effective September 1,
21 1999, states that the Konings and Bioventures enter into an
22 agreement to "repair, improve, and sell 2569 acres of land near
23 Del Norte, Rio Grande, Colorado."  The purported Agreement
24 provides that the Konings are to receive the income from the
25 initial sales of the land and an unspecified "monthly rent
26 payment that may change from time-to-time" from Bioventures.
27 Bioventures was to pay for all repairs and improvements to the
28 land and receive two-thirds of the proceeds from sales of the

property, after the Konings had recovered their original investment.  (Ex. 30 and Shepka Testimony.)

31.  The purported Joint Venture Agreement does not state any specific amount of rent, does not specify who is authorized to approve amendments on behalf of Bioventures, and does not specify any service or income Dr. Koning or any other person is to provide or assign to Bioventures.  Although the IRS asked them to do so, neither Baisden nor Dr. Koning have given the IRS a corporate charter, a list of the officers or directors, the names of any service providers or employees, a list of shareholders, or the minutes of any shareholder or board of directors meetings for Bioventures.  (Ex. 30.)  Nor did Baisden introduce into evidence any such documents at the hearing on the motion for preliminary injunction.

32.  In 2000, 2001, 2002, and 2003, Baisden prepared federal income tax returns for Michael and Susan Koning on which he reported that the Konings had earned no income attributable to wages, salaries, or tips.  Baisden reported that the Konings had earned income from interest, rent, royalty, and capital gains. Baisden reported that the rental income was attributable to several different tracts of land in Del Norte, Colorado and grassland in Rickreall, Oregon.  Baisden did not report that the Konings earned any income from non-employee compensation or as constructive dividends from Bioventures.  (Exs. 13A-E and Shepka Testimony.)

33.  Although the IRS asked them to do so, neither Baisden nor Dr. Koning have provided to the IRS a rental agreement relating to the above-listed properties.  (Shepka Testimony.)

1  Nor did Baisden introduce into evidence any such document at the
2  hearing on the motion for preliminary injunction.

3      34.   On the Konings' federal income tax returns that Baisden
4  prepared for tax years 1999 through 2003, Baisden reported Dr.
5  Koning's occupation as "investor."  From 1999 through 2003, Dr.
6  Koning worked full-time as an anesthesiologist and was the
7  President of ACN.   (Exs. 13A-13E and Shepka Testimony.)

8      35.   On Bioventures' federal income tax returns that Baisden
9  prepared for tax years 2000 through 2003, Baisden reported the
10 following items, the IRS contends are personal, as ordinary
11 business expense deductions: 1) the cost to purchase and store an
12 airplane owned by the Konings; 2) lawncare expenses for the
13 Konings' residence in North Platte, Nebraska; 3) construction and
14 other costs for the Konings' residence in Montana; 4) utilities
15 for the Konings' residence in Nebraska; 5) expenses for the
16 Konings' personal vehicles; 6) the cost of homeowners' insurance
17 for the Konings' residence in Nebraska; and 7) various costs from
18 the Konings' personal credit cards.  (Ex. 13 at ¶ 18 and Shepka
19 Testimony.)

20     36.   Although the IRS asked them to do so, neither Baisden
21 nor Dr. Koning have provided a flight log for the airplane.
22 Although the IRS asked them to do so, neither Baisden nor Dr.
23 Koning have provided any promissory note or a loan agreement.
24 When the IRS questioned them about the deductions described
25 above, neither Baisden nor Dr. Koning advised or suggested to the
26 IRS that Dr. Koning operated a home office from either of his
27 residences in Nebraska or Montana.  (Shepka Testimony.)  Nor did
28 Baisden introduce any such evidence at the hearing on the motion

1  for preliminary injunction.

2      37.   The Konings did not transfer ownership of the

3  properties to Bioventures.   Instead, they retained full ownership

4  of the property in Del Norte, Colorado, and their residences in

5  Nebraska and Montana.   (Ex. 13 at ¶ 12 and Shepka Testimony.)

6      38.   On Bioventures' federal income tax returns that Baisden

7  prepared for tax years 2000 through 2003, Baisden reported as

8  ordinary business expenses the costs related to capital

9  improvements to the property owned by Dr. Koning in Del Norte,

10  Colorado.   Such costs include expenses related to the

11  construction of roads and utilities on the property.   Baisden did

12  not report the development expenses as capital expenses, which

13  are deductible over the lifetime of the property.   Baisden did

14  not treat the Colorado property as inventory for accounting

15  purposes, whereby the costs to purchase and improve the lots

16  would be reflected as the adjusted basis of the property upon a

17  sale, rather than deductible expenses.   Dr. Koning later sold

18  individual lots of the Colorado property on various occasions

19  from 2000 through 2003.   (Ex. 13 at ¶ 13 and Shepka Testimony.)

20      39.   On federal income tax returns that Baisden prepared for

21  the Konings, Baisden reported the gains from the sales of the

22  parcels of the Colorado property, Baisden reported depreciation

23  deductions on the Konings' tax returns for the same property for

24  tax years 2000 through 2003.   (Exs. 13A-13E.)

25      40.   In addition to reporting on Bioventures' tax returns

26  deductions for the costs of the Del Norte, Colorado property,

27  Baisden reported depreciation deductions on the Konings' tax

28  returns for the same property for tax years 2000 through 2003.

11

1  (Exs. 13A-13E.)

2      41.   For tax year 2002, Baisden prepared federal tax returns

3  for William and Vicki Hastings and Amethyst Sands, Inc.   William

4  Hastings was a 50% owner of Anesthesia Consultants of Nebraska

5  and an anesthesiologist.   (Ex. 2 at ¶ 17, Ex. 2D, 2E.)

6      42.   On the Hastings' 2002 return, Baisden reported that Dr.

7  Hastings had assigned $247,682 of his income from Anesthesia

8  Consultants of Nebraska to Amethyst Sands, Inc.   On Amethyst

9  Sands' return Baisden did not report that Amethyst Sands earned

10  any income other than Hastings' income as a physician.   Yet,

11  Baisden reported ordinary business expense deductions for rent,

12  depreciation of two automobiles, and other costs for advertising,

13  contract labor, equipment rental, utilities, vehicles, and

14  lodging.   (Exs. 2D, 2E.)

15      43.   On Amethyst Sands' return Baisden reported that

16  Amethyst Sands was in the real estate business and had no

17  deductible expenses related to the compensation of officers or

18  for salaries and wages.   On Amethyst Sands' return Baisden did

19  not report that Amethyst Sands was a personal service

20  corporation.   (Ex. 2D.)

21      44.   Although the IRS asked them to do so, neither Baisden

22  nor Dr. Hastings have provided to the IRS an employment

23  agreement, joint venture agreement, or other document related to

24  the services Dr. Hastings purportedly provides to Amethyst Sands.

25  Although the IRS asked them to do so, neither Baisden nor Dr.

26  Hastings have provided to the IRS a corporate charter, a list of

27  the officers or Board of Directors, the names of any service

28  providers or employees, a list of shareholders, or the minutes of

any shareholder or Board of Directors meeting for Amethyst Sands. (Shepka Testimony.)  Nor did Baisden introduce any such evidence at the hearing on the motion for preliminary injunction.

45.   On the Hastings' return that he prepared, Baisden reported income primarily from wages from the first part of 2002 and rent from a property in Emmitt, Idaho.  (Ex. 2E.)  Although the IRS asked them to do so, neither Baisden nor the Hastings have provided to the IRS a rental agreement, lease, or other document relating to the rental of the property in Idaho. (Shepka Testimony.)  Nor did Baisden introduce any such evidence at the hearing on the motion for preliminary injunction.

46.   The IRS conducted research regarding the value of the Hastings' purported rental property, and found that the Hastings had purchased the property for approximately $100,000.  Baisden then reported that the Hastings had earned rent of $70,013 for one year for the purported rental of the property.  (Shepka Testimony.)

47.   For tax year 2002, the IRS issued a notice of deficiency to the Hastings stating that the IRS has determined that they are liable for additional taxes in the amount of $190,236 and penalties in the amount of $142,677 pursuant to I.R.C. § 6663.  The Hastings did not respond to the notice of deficiency, so the IRS assessed the additional taxes in 2006. (Ex. 2F.)

48.   Baisden prepared the federal income tax returns for Evan and Jane Geilenkirchen for the year 2002, and also for their wholly owned corporation, PTCW.  (Ex. 5D.)  Evan Geilenkirchen was a nurse anesthetist who worked with Dr. Koning at ACN in

1  North Platte, Nebraska.  (Ex. 9 at ¶ 1.)

2      49.  In 2002, Dr. Koning met with Evan Geilenkirchen at work

3  and asked if Geilenkirchen was interested in working with

4  Baisden.  Baisden later told the Geilenkirchens that by setting

5  up a corporation, they could save money on their taxes and that

6  it would offer protection from lawsuits.  (Ex. 9 at ¶ 4.)

7      50.  Baisden had the Geilenkirchens provide him the name

8  they wanted for their corporation, and he incorporated PTCW for

9  them on February 7, 2003.  (Ex. 9 at ¶ 7 and Ex. 8.)  On PTCW's

10  tax return, Baisden reported that it was incorporated on December

11  7, 2002.  Deborah Fields was listed as the President, Secretary,

12  and Treasurer of PTCW.  (Ex. 5D.)  Geilenkirchen was to be the

13  Vice-President, but the corporation did not have an employment

14  agreement, joint venture agreement, or other document related to

15  any services Geilenkirchen was to provide.  PTCW had no

16  employees.  (Williams Testimony.)

17      51.  The Geilenkirchens do not know Ms. Fields and neither

18  they nor Baisden have provided to the IRS a corporate charter, or

19  the minutes of any shareholder or Board of Directors meetings.

20  (Ex. 9 at ¶ 8.)

21      52.  Throughout 2003 and 2004, the Geilenkirchens

22  periodically sent Baisden their checking account statements,

23  credit card statements, and copies of Quicken™ spreadsheets

24  listing their expenses and income.  (Ex. 9 at ¶ 10.)

25      53.  Baisden submitted the Geilenkirchens' return for 2002

26  reporting that Evan Geilenkirchen was an investor, rather than a

27  nurse anesthetist.  Geilenkirchen did not have any investments.

28  (Ex. 9 at ¶ 19 and Williams Testimony.)

                              14

54.   Baisden also reported that Geilenkirchen had assigned his entire income of $176,164 from ACN to the PTCW corporation and that PTCW was in the real estate business.   Baisden did not report any other income to PTCW other than Geilenkirchen's ACN income.   Neither the Geilenkirchens nor PTCW rented any property or engaged in any real estate activities for the year 2002.   (Ex. 5D, Ex. 9 at ¶¶ 19, 31.)

55.   On the returns he prepared for PTCW, Baisden reported a total of $150,903 as ordinary business expense deductions, which included amounts for repairs, rent, depreciation, advertising, meals and entertainment, contract labor, insurance, supplies, and vehicle and office expenses.   The Geilenkirchens did not own any property other than their home.   Evan Geilenkirchen did not operate any business from their home though Jane Geilenkirchen did operate a small scrapbooking business from the home.   The Geilenkirchens later confirmed in IRS examinations that many of the expenses Baisden reported to PTCW as business expenses were non-deductible personal expenses.   (Ex. 5D, 5 at ¶ 25, and Williams Testimony.)

56.   Baisden reported income to the Geilenkirchens for 2002 only from royalties and refunds of taxes.   Baisden did not report any income to the Geilenkirchens as wages, non-employee compensation, or as constructive dividends.   (Ex. 9 at ¶ 31, 5E.)

57.   After meeting with the IRS to discuss their tax liability for 2002, the Geilenkirchens agreed to the assessment of additional tax in the amount of $25,713.   (Ex. 5H.)

58.   For the year 2002, Baisden prepared federal income tax returns for Burt and Pamela McKeag and their wholly owned

1  corporation, Oceana Blue Corporation.  (Exs. 1A, 1B.)

2      59.  On the 2002 return he prepared, Baisden reported that

3  Burt McKeag had assigned $93,685 of his income as an

4  anesthesiologist to Oceana Blue.  Baisden reported on Oceana

5  Blue's tax returns that it was in the real estate business and

6  had no deductible expenses related to the compensation of

7  officers or for salaries and wages.  Baisden also reported that

8  the corporation had incurred deductible business expenses for

9  equipment rental, utilities, insurance, lodging, professional

10  services, and vehicle and office expenses.  (Ex. 1A.)

11      60.  Baisden did not report on the tax returns that Oceana

12  Blue was a personal services corporation, though Dr. McKeag was

13  the sole shareholder and service provider and worked as an

14  anesthesiologist during 2002.  On Oceana Blue's tax return,

15  Baisden did not report any income other than McKeag's income as a

16  physician.  The only listed asset of the corporation was the

17  McKeags' personal automobile.  (Exs. 1A, 1B.)

18      61.  On the McKeags' individual tax return for 2002, Baisden

19  reported that the McKeags had earned $47,307 from royalty income,

20  but had not earned any income from constructive dividends or non-

21  employee compensation for Dr. Burt McKeag's work for the Oceana

22  Blue Corporation.  (Ex. 1B.)

23      62.  In 2004, the McKeags filed an amended federal income

24  tax return, which was not prepared by Baisden, stating that the

25  original Oceana Blue tax return was being amended "because the

26  entity was found to be invalid and the income and expense

27  originally reported by this entity is now reported by the

28  taxpayer and sole shareholder on this amended form 1040."  The

16

1  McKeags claimed all of the income originally attributed to Oceana
2  Blue on their amended individual tax return, and reported no
3  income for Oceana Blue on its amended tax return, stating that
4  the corporation was not valid in Nebraska for several reasons,
5  including that it was not established as a professional
6  corporation and the income was not legally assigned to the
7  corporation.  (Exs. 1D, 1E.)

8      63.  As a result of the amendments to their federal tax
9  returns, the McKeags owed an additional $764.  (Exs. 1D, 1E.)  In
10 conversations with the IRS, McKeag said that he had not produced
11 any works for which royalties would be due and that many of the
12 expenses Baisden had reported on tax returns as business
13 deductions were actually for personal expenses.  (Ex. 1 at ¶ 16
14 and Cheung Testimony.)

15     64.  Baisden prepared federal income tax returns for Michael
16 and Deanna Trierweiler for the years 2002 through 2004, Walter
17 and Deborah Weaver for 2003, and Donald and Deborah Weaver for
18 2003, and Donald and Kathryn Snoozy for 2003-2004.  (Exs. 5K-5M,
19 5P, and 5B.)  Baisden prepared federal income tax returns for the
20 Trierweilers', Weavers', and Snoozys' wholly owned corporations
21 Red Desert Resources Corporation, Axhandle Corporation, and
22 Charpup Corporation.  (Exs. 5I, 5J, 5O, and 5A.)

23     65.  On the corporate income tax returns Baisden prepared
24 for Red Desert, Axhandle, and Charpup, Baisden reported that all
25 three corporations were in the real estate business and had no
26 deductible expenses related to the compensation of officers or
27 for salaries and wages.  Baisden reported that Michael
28 Trierweiler, Walter Weaver, and Kathryn Snoozy had assigned their

17

incomes as medical professionals to their corporations.  Baisden reported no other income to any of the corporations.  Baisden did not report that any of Red Desert, Axhandle, or Charpup were personal services corporations.  (Exs. 5A, 5I, 5J, and 5O.)

66.  Although the IRS asked them to do so, neither Baisden nor his customers have provided to the IRS an employment agreement, joint venture agreement, or other document related to the services Dr. Trierweiler, Dr. Weaver, and Ms. Snoozy purportedly provided to their corporations.  Although the IRS asked them to do so, neither Baisden nor his customers have provided to the IRS a corporate charter, a list of the officers or board of directors, the names of any service providers or employees, a list of shareholders, or the minutes of any shareholder or board of directors meetings for the corporations. (Williams Testimony.)  Nor did Baisden introduce any such evidence at the hearing on the motion for preliminary injunction.

67.  On federal income tax returns that he prepared for Red Desert, Axhandle, and Charpup, Baisden reported ordinary business expense deductions for rent, repairs, depreciation of automobiles, and other costs for advertising, contract labor, equipment rental, utilities, travel, vehicles, professional services, and lodging.  (Exs. 5A, 5I, 5J, and 5O.)  Although the IRS asked them to do so, neither Baisden nor his customers have provided to the IRS documentation to support the claim that all of the reported deductions are for legitimate business expenses. (Williams Testimony.)

68.  On the federal income tax returns he prepared for the Trierweilers, Weavers, and Snoozys, Baisden reported that Kathryn

1  Snoozy, Walter Weaver, and Michael Trierweiler were employed as

2  "investors."  In actuality, Trierweiler and Weaver were

3  physicians and Snoozy was a nurse anesthetist.  (Exs. 5K-5M, 5P,

4  5B and Williams Testimony.)

5       69.  On the federal income tax returns he prepared for the

6  Trierweilers and Snoozys, Baisden reported large amounts of

7  income from the purported rental of the commercial properties in

8  Nebraska and South Dakota.  Although the IRS asked them to do so,

9  neither Baisden nor the Trierweilers or Snoozys have provided a

10  rental agreement, lease, or other document relating to the rental

11  of the properties.  (Exs. 5K-5M, 5P, 5B and Williams Testimony.)

12  Nor did Baisden introduce any such evidence at the hearing on the

13  motion for preliminary injunction.

14       70.  On the federal tax returns Baisden reported that the

15  Weavers had sustained $46,352 in losses and depreciation due to

16  the operation of a farm.  The Weavers provided documentation to

17  support the rental of the farm land by a third party of their

18  property in 2004, but no documentation to support the operation

19  of a farm in 2003.  (Exs. 5P and 13 at ¶¶ 7-12, and Williams

20  Testimony.)

21       71.  The IRS has not issued final determinations regarding

22  the tax liabilities of the Trierweilers, Snoozys, and Weavers.

23  The IRS estimates that the tax returns Baisden prepared for these

24  customers greatly understate their true tax liabilities.  (Ex. 5

25  at ¶¶ 16-18, 29, 33, and 34.)

26       72.  Baisden also advocated the use of his tax methods to

27  prospective customers Shane Kryzsko and Dr. Michael Bianco.  In

28  June 2002, Baisden met with Kryzsko, a nurse anesthetist employed

1  by ACN, and explained that he could help Kryzsko form a

2  corporation through which he could deduct personal expenses and

3  reduce his claimed federal income tax liability.  Baisden told

4  Kryzsko that he established the corporations in Nevada because

5  that state's laws are more protective regarding the disclosure of

6  corporate ownership information.

7  73.  In 2003, Baisden met with Dr. Michael Bianco, an

8  obstetrician/gynecologist who also works at the Great Plains

9  Regional Medical Center.  Baisden also told Bianco that by using

10  his tax methods, Bianco would reduce his tax liability.  Baisden

11  explained that he would use a corporation in Nevada because the

12  IRS and other government agencies would not have access to

13  corporate ownership information.  Baisden told Bianco that, using

14  the corporation, he could take deductions for Bianco's personal

15  residence, cars, telephones, travel expenses and computer.  (Ex.

16  4 at ¶ 7.)  No contrary evidence was presented.

17

18  **BAISDEN'S TAX PREPARATION IN CALIFORNIA**

19  74.  Baisden prepared federal income tax returns for Joel

20  and Deborah Cooper for the years 2002 through 2004, as well as

21  the corporate income tax returns for Joel N. Cooper Physical

22  Therapist, Inc.  Although Joel Cooper was the owner of the

23  corporation and provided some physical therapy services, Baisden

24  reported that the corporation had not paid any wages or other

25  compensation to officers for the year 2004.  (Ex. 14B.)

26  75.  On Cooper's corporation's tax return, Baisden reported

27  ordinary business deductions for items including the Coopers'

28  golf course expenses, country club membership, home utilities,

1  pool expenses, the majority of their car expenses, the cost of a
2  van, and portions of the cost of constructing their home.  (Ex.
3  14B, Ex. 6 at ¶ 12.)

4      76.  Baisden did not report that the corporation had paid
5  any constructive dividends or non-employee compensation to the
6  Coopers.  For the years 2002 and 2004, Baisden reported that the
7  Coopers had only a small amount of wages, and had earned the
8  great majority of their income from rent from two medical
9  properties owned by the Coopers.  (Ex. 6 at ¶¶ 8-15, 6A-6C, 14 at
10  ¶¶ 10-15.)

11      77.  The IRS conducted an examination of the Coopers' tax
12  liability and met with Cooper and Baisden.  After the meetings,
13  the IRS determined that many of the deductions Baisden had
14  reported for business expenses were actually for non-deductible
15  personal expenses, and the IRS issued a Notice of Deficiency for
16  the year 2002 stating that the Coopers owe an additional $29,137
17  for the year 2002.  (Exs. 6 and 14.)  No contrary evidence was
18  presented.

19      78.  Baisden prepared federal income tax returns for Sue
20  Brittian wherein he reported deductions for expenses related to
21  Brittian's sewing activities.  The IRS determined that Brittian
22  was liable for additional taxes in the amount of $4,888 because
23  of improper deductions for expenses Baisden had reported
24  including: tennis lessons, club membership, vacations, a scooter,
25  and utility payments.  Brittian has appealed the determination,
26  but no final decision on the appeal has been rendered.  (Ex. 6 at
27  ¶¶ 16-17.)

28      79.  Baisden prepared federal income tax returns for Daniel

1    Swartz and Jennifer Erale for the years 2002 through 2004 on

2    which he reported that the Swartzes had incurred losses from the

3    operation of a farming business.  (Ex. 6F, Ex. 6 at ¶¶ 19-20.)

4         80.  After discussing the Swartzes' purported business

5    activity with Baisden, the IRS determined that Baisden had

6    improperly reported that the Swartzes operated a farm business

7    because though they owned a horse, the horse was not trained, the

8    Swartzes derived no income from the horse, and had no evidence to

9    support the business use of the animal.  The IRS determined that

10   the Swartzes are liable for additional taxes in each year of more

11   than $35,600.  The Swartzes have appealed the IRS determinations,

12   but no final decision on the appeals have been rendered.  (Ex. 6

13   at ¶¶ 19-22.)

14        81.  Baisden prepared federal income tax returns for Anthony

15   and Kimberly Telese for the years 2002 through 2004, and their

16   corporation Anthony Telese Company, Inc.  On the Teleses

17   individual federal income tax returns, Baisden reported that the

18   Teleses had earned the vast majority of their income from rent.

19   Anthony Telese worked full time for his engineering business.

20   (Ex. 14C, 14D, 14E, Ex. 14 at ¶ 18.)

21        82.  After neither Baisden nor the Teleses provided a rental

22   agreement or documentation to support the claimed rent in

23   response to IRS inquiries, the IRS conducted research to

24   determine a reasonable rent for the property the Teleses' owned

25   that was used by Telese's engineering business.  The IRS found

26   that the amount Baisden reported as rent was not consistent with

27   rental rates for Bakersfield, California for the property.

28   (Chynoweth Testimony.)

1    83.   On the federal tax returns Baisden prepared for the
2    Teleses' corporation, Baisden reported ordinary business expense
3    deductions for items including the cost of a motorcycle, another
4    personal vehicle, utility payments and other expenses.  The IRS
5    determined that the Teleses owed $117,637 in additional taxes for
6    2002, and substantial additional taxes for 2003.  The IRS re-
7    allocated a portion of the rent to wages to Telese, and also
8    determined that Telese's corporation owes additional employment
9    taxes.  The Teleses have appealed the determinations, but no
10   final decision on the appeal has been rendered.  (Ex. 14 at ¶¶
11   21-22.)  No other evidence.

12   84.   Baisden prepared federal income tax returns for Joseph
13   and Rhonda Shyselinck for the year 2002, (Ex. 14F), and their
14   corporation Chuck's Automotive.  On the Ghyselincks' individual
15   federal income tax returns, Baisden reported that the Ghyselincks
16   had earned the vast majority of their income from rent.  Joseph
17   Shyselinck worked full-time in his automotive business.  (Ex. 14
18   at ¶¶ 4-8.)

19   85.   After neither Baisden nor the Ghyselincks provided a
20   rental agreement or documentation to support the claimed rent in
21   response to IRS inquiries, the IRS conducted research to
22   determine a reasonable rent for the property the Ghyselincks
23   owned that was used by Chuck's Automotive.  The IRS found that
24   the amount Baisden reported as rent was not consistent with
25   rental rates for Bakersfield, California, for the property.
26   (Chynoweth Testimony.)

27   86.   On the federal tax returns Baisden prepared for Chuck's
28   Automotive, Baisden reported ordinary business expense deductions

23

1  for items including medical expenses, life insurance, car
2  expenses, and for the repair of a recreational vehicle.  After
3  the IRS met with the Ghyselincks and a new accountant in 2005,
4  the Ghyselincks agreed to reallocate $24,000 of the amount
5  Baisden reported as rent to salary to Joseph Shyselinck.  The
6  Ghyselincks agreed to the disallowance of some of the expenses
7  Baisden reported as business expense deductions, and agreed to
8  additional taxes of $2,316 individually, and additional tax to
9  their corporation of $8,765.  (Ex. 14 at ¶¶ 4-9.)  No contrary
10 evidence.

11

12                           UNFILED RETURNS

13      87.  Baisden's customers have not filed federal income taxes
14 for the following years: Konings for 2004-2005, Bioventures for
15 2003-2005, Snoozys for 2003-2004, Trierweilers for 2005, Weavers
16 for 2004-2005, Hastings for 2003-2005, Johng for 2002-2005,
17 Swartzes for 2005, and the Teleses for 2005.  Many of Baisden's
18 customers' corporations have similarly not filed past due tax
19 returns.  Neither Baisden nor his customers have secured
20 extensions such that the tax returns would not be deemed late
21 upon filing.  (Ex. 2 at ¶¶ 16, 33, Ex. 5 at ¶ 41, 43, Ex. 14 at ¶
22 23, Ex. 27.)

23      88.  In addition, the Geilenkirchens retained and paid
24 Baisden to prepare tax returns for the years 2003 and 2004.
25 After Baisden had not prepared the returns by their required
26 filing dates, the Geilenkirchens retained a new accountant to
27 prepare and file the returns.  After the return-filing deadlines
28 passed, Baisden told the Geilenkirchens that he had not filed

                              24

their returns because he was awaiting a determination from the
IRS regarding the Konings' tax returns.  (Ex. 9 at ¶¶ 14, 15, and
21.)

89.  Baisden told the Geilenkirchens that though he had not
filed their tax returns, they would not suffer any overall harm
because of the amount they were saving in taxes.  Despite the
unfiled returns, Baisden told the Geilenkirchens a specific
amount of estimated tax payments they should make.  Pursuant to
Baisden's advice, the Geilenkirchens made estimated tax payments
in the amount of $1,300 for the year 2003.  (Ex. 9 at ¶ 23.)
After a new accountant prepared their taxes for 2003, the
Geilenkirchens reported a total tax liability of $26,293.  (Ex.
5F.)

90.  When questioned by the IRS about his unfiled returns,
Hastings told the IRS that he would not file the returns until a
determination has been made by the IRS regarding Mr. Baisden's
tax advice.  (Shepka Testimony.)  Baisden states that he has
advised some of his customers not to file federal tax returns
because of pending IRS investigations.  (Doc. 22 at ¶ 44.)

91.  Baisden states that he is aware of his customers' past
due federal income tax returns, and that he intends to assist at
least one customer in filing the returns.  (Doc. 22 at ¶¶ 43-44.)
Baisden states that he believes that his customers have made
estimated tax payments.  Bioventures has made no estimated tax
payments for 2003 through 2005.  The Konings have made estimated
tax payments of $2,800 for 2004, and $45,000 for 2005.  (Exs. 24,
25.)  For much of the year 2004, Dr. Koning continued to work as
an anesthesiologist for Anesthesia Consultants.  (Shepka

1  Testimony.)

2     92.   The Hastings and Amethyst Sands have made estimated
3  federal income tax payments for 2003 through 2005 in the amounts
4  of $56,125, $62,750, and $18,000.  From 2003 through 2005,
5  Hastings continued to work as an anesthesiologist at the Great
6  Plains Regional Medical Center.  (Ex. 13 at ¶ 9, Ex. 23.)  The
7  Snoozys and Charpup Corporation made estimated federal income tax
8  payments of $3,625 and $1,500 for 2003 and 2004, though they
9  continued to work as an educator and nurse anesthetist throughout
10 2003 and 2004.  (Exs. 15, 16.)  The Trierweilers made estimated
11 tax payments of $9,000 for 2005, though Michael Trierweiler
12 continued to work as a physician during the year.  (Ex. 19.)  The
13 Weavers have made estimated tax payments of $77,700 for 2004 and
14 $88,000 for 2005, though the majority of the payments are
15 attributable to Deborah Weaver's withholdings.  (Ex. 20.)  The
16 Weavers continued to work as physicians throughout 2004 and 2005.
17 (Williams Testimony.)

18    93.   No contrary evidence was adduced about filing of tax
19 returns.

20

21                        ARCTURUS CORPORATION

22    94.   Baisden acted as a consultant for the Arcturus
23 Corporation.  (Doc. 22, ¶ 31.)  In the year 2003, the Snoozys and
24 Hastings arranged to have portions of their incomes diverted
25 monthly from ACN to Arcturus Corporation.  The IRS requested that
26 the Snoozys and Hastings provide documentation regarding the
27 diverted income, but Baisden, the Snoozys, and the Hastings
28 failed to provide any contracts, agreements, or other documents

regarding the "investment plan" with Arcturus.  Baisden has also provided no documents in response to the preliminary injunction motion.  (Shepka and Williams Testimony.)

95.  Baisden states that the primary purpose of Arcturus is to purchase shares of stock in medical practices, and that "investors" did not have a repurchase option.  (Doc. 22 at ¶ 30.) Both the Snoozys and Hastings told the IRS during their examinations that they believed they could retrieve the assets they had "invested" in Arcturus at any time, except for the management fee paid to Baisden and Dr. Koning.  (Williams and Shepka Testimony.)  Dr. Koning also told Mr. Kryzsko about a repurchase option.  (Ex. 3 at ¶ 16.)

96.  Baisden states that Arcturus has other purposes including management, insurance reimbursement analysis, medical billing and accounting, and taxes.  (Doc. 22 at ¶ 30.)  In a review of Arcturus records, the IRS found no evidence of such activities during the time the Snoozys and Hastings were diverting their income to the corporation.  (Shepka Testimony.) Baisden has provided no evidence in response to the preliminary injunction motion of such activity in 2003.

## BAISDEN'S OTHER CONDUCT

97.  In customer examinations, Baisden has failed to timely provide all of the documents the IRS has requested by information request and by summons.  On at least one occasion, Baisden told customers that they should do nothing in response to the IRS's inquiries, that the IRS would ignore their lack of response, and that the IRS was engaging in a "witchhunt."  (Ex. 9 at ¶¶ 28,

27

1   33.)

2       98.   In four instances, the IRS issued summonses directly to

3   his clients after Baisden refused to provide the requested

4   documents and appear for meetings with IRS agents.   Only after

5   the clients themselves received summonses did the four clients

6   provide the requested documents and testimony.   (Ex. 5 at ¶¶ 35-

7   36.)

8       99.   On approximately seven occasions, Baisden failed to

9   attend meetings he had scheduled with the IRS agent in Nebraska

10  related to examinations to determine Baisden's clients' true tax

11  liabilities.   Despite numerous requests from the IRS that he do

12  so, Baisden has never attended a meeting with Agent Williams.

13  (Williams Testimony.)

14      100.   On one occasion, Baisden scheduled a meeting with an

15  IRS agent in California on the same date he had scheduled a

16  meeting with an IRS agent in Nebraska and failed to show up for

17  either meeting.   (Ex. 11 at ¶¶ 17-19.)

18      101.   During customer examinations, Baisden has filed IRS

19  Forms 911 claiming that the IRS summonses were causing his

20  customers a hardship.   The IRS Taxpayer Advocate's office

21  determined that none of the forms Baisden submitted had merit.

22  Baisden's filing of the Forms 911 caused interruptions to IRS

23  investigations during the pendency of the taxpayer advocate

24  investigations.   (Ex. 5 at ¶¶ 37-38, Ex. 6 at ¶ 35, Williams and

25  Chynoweth Testimony.)

26      102.   The Government has issued no criminal indictments

27  against Baisden or any of his clients relating to alleged

28  improper tax practices.

1    103.   The Internal Revenue Service has not issued Forms 4549

2   or statutory notices of deficiency to the majority of Baisden's

3   clients that it has audited.

4    104.   No cases have been litigated in tax court pertaining

5   to Baisden's alleged tax practices.

6    105.   On occasion some of these corporations entered a joint

7   venture with the individual taxpayer-owner to carry on an

8   additional business activity, such as the development of real

9   estate in the case of the Konings.

10    106.   In at least one case an individual client purchased

11  real estate and reported on his or her return monthly rent from

12  the property paid to the individual by the corporation.

13    107.   The monthly rent is allegedly based on a combination

14  of the market value and the assessment of "risk" that the

15  individual is taking.   No evidence of fair rental value was

16  presented.

17    108.   If real property is sold, both the corporation and the

18  individual share in the income based on their alleged relative

19  risk throughout the joint venture.

20    109.   In the case of physician clients, their corporations

21  earned income by contracting with a medical practice unit to

22  provide it medical services, and contracted with the individual

23  to work as a physician for that particular medical unit.

24    110.   Bioventures Corporation contracted with Anesthesia

25  Consultants of Nebraska for physician services.   Income for such

26  medical services was reported by the corporation.   Rental income

27  was being paid by Bioventures Corporation and that corporation

28  deducted the rent.   No evidence was adduced how such rent was

1  established.

2      111.   Baisden argues that neither Bioventures nor any of the

3  other tax structures discussed at the hearing engaged in any

4  scheme to avoid taxes.

5      112.   Baisden claims to have advised his clients that they

6  needed to keep track of their business related expenses because

7  there could be an audit.  Not all documents requested by the IRS

8  from Baisden and/or his clients were produced.

9      113.   Baisden asserts he informed his clients that expenses

10  that were 100% personal needed to be paid with personal funds,

11  which included personal residence mortgage, personal residential

12  property taxes, food purchased at the grocery store, clothes, all

13  expenses for children, tithing, individual income taxes, personal

14  savings, and the personal use of personal residence.

15      114.   Baisden alleges he does not advise clients that

16  improvements to their homes may be deducted by their

17  corporations.

18      115.   Baisden produced approximately 25,000 documents to the

19  IRS with regard to the Koning audit.

20      116.   Some of Baisden's clients made some estimated tax

21  payments during the years they did not file returns.   The

22  estimates are a fraction of what the IRS claims these taxpayers

23  owe for taxes.

24      117.   Baisden claims he informed the IRS that any personal

25  improvements will be repaid to the corporation.

26      118.   In connection with improvements to Mr. Koning's home,

27  Koning claims that the note receivable in favor of his

28  corporation for amounts paid to improve his residence during 2003

1  and 2004 have been "paid back" with leasehold improvements made

2  in 2004 and 2005 for a new retail store that his corporation now

3  operates.

4      119.   Plaintiff did not provide the court with most of the

5  back-up documents that its agents relied upon in arriving at

6  their opinions, which is information that the IRS has in its

7  possession and control.

8      120.   The IRS initiated 11 audits of Baisden's clients

9  concurrently during the 2005 accounting tax season.

10     121.   Baisden claims he gave his clients the option of his

11 acting as their Power of Attorney and the clients' election to

12 appoint him as such was "voluntary."

13     122.   Arcturus Corporation ceased doing business in August

14 2004.

15     123.   Agent Peter Shepka did not characterize Amethyst Sands

16 as a sham corporation.   However, he did characterize a similar

17 corporation, Bioventures, as a "sham."

18     124.   The Employer Identification Number used by Baisden is

19 valid and was issued to him by the Internal Revenue Service.

20     125.   At least six of Baisden's 30 clients use the disputed

21 corporate tax structure at issue.

22     126.   Baisden argues he would suffer significant harm were a

23 preliminary injunction issued preventing him from practicing

24 accounting and working as a tax preparer.

25

26                          CONCLUSIONS OF LAW

27     1.    The Plaintiff seeks injunctive relief under IRC 7402,

28 7407, and 7408.   The Government has the burden of proof for

                                31

1    proving each of the following elements: (a) organization, sale or

2    participation in organizing an entity or plan; (2) making of

3    false or fraudulent statements regarding tax benefits; (3)

4    knowledge or reason to know that the tax matters are fraudulent;

5    (4) the false statements pertain to a material matter; and (5) an

6    injunction is necessary to prevent recurrence of this conduct.

7         2.   As to IRC 7402, Plaintiff bears the additional burden

8    of proving each element of traditional equitable relief: (1)

9    substantial likelihood of succeeding on the merits; (2)

10   substantial threat of irreparable harm; (3) injury that outweighs

11   the opponent's injury; and (4) harm to public interest.

12        3.   The United States has established a substantial

13   likelihood that Baisden has in some instances engaged in conduct

14   subject to penalty under I.R.C. §§ 6700 and 6701 and there is a

15   substantial likelihood that injunctive relief is appropriate to

16   prevent the recurrence of such conduct.

17        4.   The United States has established a substantial

18   likelihood of success in proving that Baisden is subject to at

19   least a partial injunction under I.R.C. § 7407 because he has

20   engaged in conduct subject to penalty under I.R.C. § 6694 and

21   there is a substantial likelihood that injunctive relief is

22   appropriate to prevent the recurrence of such conduct.

23        5.   The United States has established a substantial

24   likelihood of success in proving that Baisden has otherwise

25   interfered with the proper administration of the internal revenue

26   laws and an injunction under I.R.C. § 7402 is necessary or

27   appropriate for the enforcement of the internal revenue laws.

28        6.   Baisden has engaged in conduct some of which is likely

subject to penalty under I.R.C. § 6700 by developing, organizing and promoting a plan or arrangement that encourages and assists professional customers to create corporations to which they purportedly assign their professional incomes, the primary or only purpose for which is to decrease their tax liability.  In so doing, Baisden has made the following statements that constitute conduct subject to the § 6700 penalty:

a.   Baisden inaccurately advised customers that by using corporations they can deduct personal expenses that are not ordinarily deductible to individuals;

b.   Baisden inaccurately advised customers who he knows are statutory employees of corporations that they can assign all of their incomes to other corporations;

c.   Baisden inaccurately advised customers that they could assign their professional employment income to corporations having reason to know that some of such corporations do not have any legitimate business activity other than the activities of his clients, medical professionals themselves;

d.   Baisden inaccurately advised clients or potential clients that they can save specific amounts of taxes by creating or using corporations to which they can assign their income.

7.   Baisden has engaged in conduct subject to penalty under I.R.C. § 6701 by preparing federal tax returns for customers for submission to the IRS containing items he knew would result in understatements of customers' tax liability.  Baisden has engaged in conduct subject to penalty under I.R.C. § 6694 by preparing federal tax returns for customers containing understatements of liability based on positions for which there was no reasonable

33

basis for avoiding tax liability.  Baisden has also engaged in conduct subject to penalty under I.R.C. § 6694 by preparing federal tax returns containing understatements of tax due to a willful attempt to understate such liabilities, and in reckless or intentional disregard of the internal revenue laws and regulations.  Baisden has done so by:

a.   Preparing some federal tax returns claiming deductions for business expenses that are in fact non-deductible personal expenses, and/or for which he and his customers have not produced supporting documentation;

b.   Preparing some federal tax returns and forms containing misstatements of fact as to customers' occupations, the business activities of corporations, dates of incorporation, and customers' sources of income;

c.   Preparing some tax returns of corporations engaged only in the activities related to the field of medical services and failing to properly identify such corporations as personal services corporations;

d.   Preparing some federal tax returns for clients on which he assigns the entire incomes of statutory employees to their corporations and on which he does not report a reasonable compensation to the owners/employees of corporations;

e.   Preparing some federal tax returns for clients on which he mischaracterizes wage or dividend income as rent or royalties to individual owners;

f.   Preparing some federal tax returns for clients on which he reports ordinary business deductions for items that are capital expenses that cannot be deducted in one year, or for the

34

costs of items intended to be sold, and properly categorized as inventory;

       g.   Preparing some federal tax returns for clients containing deductions for purported business expenses when the clients have not provided supporting evidence to show they are engaged in legitimate business activities with the intent to make a profit.

   8.   Baisden has in some instances obstructed or interfered with lawful IRS investigations in the following manner:

       a.   Advising his clients not to file federal tax returns by the proper filing date;

       b.   Advising his clients to make estimated federal income tax payments substantially below the amounts lawfully due;

       c.   Advising some of his clients not to comply with IRS investigations in any way and advising some customers to ignore IRS requests for documents;

       d.   Filing IRS forms 911 on behalf of his clients asserting claims that are false or have no merit;

       e.   Repeatedly and inexcusably failing to provide documents requested by the IRS;

       f.   Interrupting and otherwise not allowing clients to answer questions posed by the IRS agents during interviews and examinations;

       g.   Making factual misrepresentations to the IRS and his clients regarding the status of IRS investigations and examinations;

       h.   Repeatedly agreeing to scheduled appointments with IRS agents and then failing to attend.

1

<u>CONCLUSION</u>

2    The Court further ORDERS as follows:

3    1.  A preliminary injunction shall issue, in the form

4 previously prepared and filed with the court;

5    2.  Baisden is ordered to serve a copy of the Order of

6 Preliminary Injunction on the customers listed on the Order; and

7    3.  Baisden is ordered to provide proof of service of the

8 Order of Preliminary Injunction to the United States within 20

9 days following date of service of this Order.

10

11 DATED:  April 5, 2007.

12

13                       /s/ Oliver W. Wanger

                            _____

14                         Oliver W. Wanger

                   UNITED STATES DISTRICT JUDGE

15

16

17

18

19

20

21

22

23

24

25

26

27

28

36