# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>LOWELL BAISDEN.<br><br>Defendant.<br>_____/ | CASE No. 1:06-cv-01368-AWI-MJS<br><br>FINDINGS AND RECOMMENDATIONS, INCLUDING FINDINGS OF FACT AND CONCLUSIONS OF LAW, (1) DENYING DEFENDANT'S MOTION TO STRIKE PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT, (2) GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (3) DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT<br><br>(ECF Nos. 209, 217, 220)<br><br>FOURTEEN-DAY OBJECTION DEADLINE |

## I.    PROCEDURAL HISTORY

Plaintiff, United States of America, initiated this action by filing a Complaint for Permanent Injunction (Compl., ECF No. 1) on September 29, 2006 pursuant to §§ 7402, 7407, and 7408 of the Internal Revenue Code (26 U.S.C. or I.R.C.). In the Complaint, Plaintiff seeks to permanently bar Defendant Lowell Baisden ("Defendant" or

-1-

"Baisden") from: (a) promoting any investment, business venture, or other plan or arrangement and in connection therewith making false or fraudulent representations about federal tax benefits or treatment, (b) engaging in any other activity subject to penalty under I.R.C. §§ 6700 and 6701, or any other penalty provision in the Internal Revenue Code, (c) preparing, assisting, or filing federal income tax returns, amended returns, and other related documents and forms for others, (d) causing other persons or entities to understate their federal tax liabilities and avoid paying federal taxes, (e) engaging in any other activity subject to penalty under I.R.C. §§ 6694 and 6695, (f) representing anyone before the Internal Revenue Service ("IRS"), and (g) engaging in any other conduct that interferes with the administration or enforcement of the internal revenue laws. (Compl. at 14-15.)

On March 15, 2007, this Court issued an order enjoining Defendant and those acting with him, pending trial and final judgment in this case or further order of the Court, from:

1.    Advising or facilitating current [clients], prospective clients, or any other persons, not to file tax returns, or that Federal Income Tax Returns are not required to be filed;

2.    Advising or facilitating or assisting clients in engaging in activity for which clients claim or report nondeductible personal expenses as valid business expense deductions;

3.    Knowingly misrepresenting or omitting to disclose on any tax return or in any communication to the United States or its IRS any material fact concerning the income, lawfully deductible expenses, or other condition or

event that concern the preparation of accurate tax returns;

4.      Advising or facilitating the knowing misstatement or omission to disclose

        by any client to the United States or its IRS of the business activity,

        income, expense, net worth, or any other material fact that is necessary to

        the accurate preparation of Federal tax returns;

5.      Advising or assisting clients to not report income of any kind or nature

        required by the law to be reported on tax returns;

6.      Advising or assisting any client to claim or overstate any improper

        deduction in violation of law;

7.      Making any statement to clients or prospective clients that the United

        States and/or its IRS endorses, agrees with [Baisden's practices], or that

        Baisden's past practices have been endorsed, approved, or that his

        clients' audits will be successful by virtue of any matter that has occurred

        in this case; and

8.      Knowingly engaging in any other conduct that wrongfully interferes with

        the administration or enforcement of the Internal Revenue laws of the

        United States.

        On April 10, 2007, the Court issued related Findings of Fact and Conclusions of

Law arising out of the hearing on Motion for Preliminary Injunction. (Findings and

Conclusions, ECF No. 80.)[1]

        On May 22, 2008, the Court issued an order staying this civil case pending

---

[1] As clarified and modified by order filed June 20, 2007. (Order Clarifying and Modifying, ECF No. 102.)

conclusion of criminal proceedings against the Defendant and notification from Plaintiff of intention to proceed with prosecution of this case. (Order re Stay, ECF No. 178.) Much later, on October 3, 2011, Defendant pled guilty to aiding and abetting the commission of tax evasion as set forth in Count IV of the Indictment in United States v. Lowell Baisden, Case No. 4:09-cr-3031 (D. Neb.). On January 26, 2012, he was sentenced to 37 months in the custody of the U.S. Bureau of Prisons. He remains incarcerated in Taft, California, at this time. On February 2, 2012, Plaintiff notified the Court of conclusion of criminal proceedings and its intention to proceed and requested the stay be lifted. (Notice Intent Proceed, ECF No. 187.) The case was reopened and a trial date set.[2] (ECF Nos. 183, 194.)

Pending before the Court are: (1) Plaintiff's Motion for Summary Judgment filed August 9, 2012 (Pl. Mot. Summ. J., ECF No. 209); (2) Defendant's Motion for Summary Judgment filed on August 9, 2012 (Def. Mot. Summ. J., ECF No. 217); and (3) Defendant's Motion to Strike Plaintiff's Motion for Summary Judgment filed on August 31, 2012 (Def. Mot. Strike, ECF No. 220.) The parties have filed their respective opposition documents. (Def. Opp'n Mot. Summ. J., ECF No. 221; Pl. Opp'n Mot. Summ. J., ECF No. 224); Pl. Opp'n Mot. Strike, ECF No. 225.) Defendant has filed reply documents. (Def. Reply Mot. Strike, ECF No. 229; Def. Reply Mot. Summ. J., ECF No. 231.)

On October 26, 2012, the District Judge assigned to this case referred the foregoing Motions, deemed submitted, to the undersigned Magistrate Judge for findings

---

[2] The trial date was vacated due to the pendency of the cross-motions for summary judgment. (ECF No. 239.)

and recommendations. (Order Ref. Mot.'s, ECF No. 240.)

For the reasons set forth below, the Court recommends that Defendant's Motion to Strike be denied; Plaintiff's Motion for Summary Judgment be granted in part and denied in part; and Defendant's Motion for Summary Judgment be denied.

## II.   **MOTION TO STRIKE**

Defendant moves to strike Plaintiff's Motion for Summary Judgment on the ground that Plaintiff did not comply with the Scheduling Order requirement that as the moving party, it "meet and confer" with the opposing party prior to filing and file a joint statement.

### A.   **Applicable Law**

Failure to comply with this Court's orders, local rules, and the Federal Rules of Civil Procedure "may be grounds for the imposition by the Court of any and all sanctions . . . within the inherent power of the Court." Local Rule 11-110. Courts have the inherent power to control their docket and in the exercise of that power, they may properly strike documents. Ready Transp., Inc. v. AAR Mfg., Inc., 627 F.3d 402, 404-05 (9th Cir. 2010).

The decision to grant or deny a motion to strike is vested in the trial judge's sound discretion. Talbot v. Robert Matthews Distrib. Co., 961 F.2d 654, 664–65 (7th Cir. 1992), citing Alvarado–Morales v. Digital Equip. Corp., 843 F.2d 613, 618 (1st Cir. 1988). Courts generally disfavor motions to strike, however, because they propose a drastic remedy and are typically a delay tactic. Mag Instrument, Inc. v. JS Prod.'s Inc., 595 F.Supp.2d 1102, 1106 (C.D. Cal. 2008); Stabilisierungsfonds Fur Wein v. Kaiser Stuhl Wine Distribs. Pty. Ltd., 647 F.2d 200, 201 (D.C. Cir. 1981).

The movant not only must demonstrate the allegedly offending material is subject to being stricken, but must also show how such material will cause prejudice. Fed. R. Civ. P. 12(f); see also Mag Instruments, Inc., 595 F.Supp.2d at 1106 ("Given their disfavored status, courts often require a showing of prejudice by the moving party before granting the requested relief."), citing Neilson v. Union Bank of Cal., N.A., 290 F.Supp.2d 1101, 1152 (C.D. Cal. 2003).

**B.    Defendant's Argument**

Defendant, in his moving papers, argues that Plaintiff did not comply with the requirements in the Court's April 5, 2012 Amended Scheduling Order (ECF No. 194) and first meet and confer with Defendant before filing a joint statement of undisputed facts or provide good cause for failing to have done so.

**C.    Plaintiff's Argument**

Plaintiff concedes it did not comply with the Court's Amended Scheduling Order; it did not file a joint statement of undisputed facts or provide good cause for its failure to have done so. Plaintiff asserts, however, that it did "meet and confer" with Defendant about the motion and that it made an honest, but harmless, mistake in not timely filing the joint statement. Plaintiff argues that the error was remedied with the filing of Defendant's Opposition Separate Statement and Plaintiff's admittedly belated filing of a Joint Statement of Undisputed Facts. (ECF No. 225-1.) Plaintiff argues that the sanction requested by Defendant is drastic and that granting it would serve no purpose but only unnecessarily consume time and resources and duplicate what is now before the Court.

**D.    Discussion**

There is no good cause nor justification for striking Plaintiff's Motion.

Plaintiff failed to comply with the Scheduling Order. However, it did file a Separate Statement of Undisputed Facts and, later, a Joint Statement, and Defendant filed an Opposing Separate Statement. (ECF Nos. 210, 222 & 225-1.) Thus the parties' respective positions on the facts have been made clear to each other and to the Court. Defendant has not suffered any prejudice as a result of the matter proceeding as it did. Defendant has not even argued that he suffered any prejudice.

Defendant's Motion to Strike Plaintiff's Motion for Summary Judgment (ECF No. 220), should be denied.

## III.   PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

### A.   Applicable Law

#### 1.   Summary Judgment

Any party may move for summary judgment, and the Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Washington Mutual Inc. v. U.S., 636 F.3d 1207, 1216 (9th Cir. 2011). Each party's position, whether it be that a fact is disputed or undisputed, must be supported by (1) citing to particular parts of materials in the record, including but not limited to depositions, documents, declarations, or discovery; or (2) showing that the materials cited do not establish the presence or absence of a genuine dispute or that the opposing party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1). While the Court may consider other materials in the record not cited to by the parties, it is not required to do so. Fed. R. Civ. P. 56(c)(3); Carmen v. San Francisco Unified School Dist., 237 F.3d 1026, 1031 (9th Cir. 2001).

In resolving cross-motions for summary judgment, the Court must consider each party's evidence. <u>Johnson v. Poway Unified School Dist.</u>, 658 F.3d 954, 960 (9th Cir. 2011). Plaintiff bears the burden of proof at trial, and to prevail on summary judgment, he must affirmatively demonstrate that no reasonable trier of fact could find other than for him. <u>Soremekun v. Thrifty Payless, Inc.</u>, 509 F.3d 978, 984 (9th Cir. 2007). Defendant does not bear the burden of proof at trial and in moving for summary judgment, he need only prove an absence of evidence to support Plaintiff's case. <u>In re Oracle Corp. Securities Litigation</u>, 627 F.3d 376, 387 (9th Cir. 2010).

In judging the evidence at the summary judgment stage, the Court does not make credibility determinations or weigh conflicting evidence, <u>Soremekun</u>, 509 F.3d at 984, and it must draw all inferences in the light most favorable to the nonmoving party and determine whether a genuine issue of material fact precludes entry of judgment. <u>Comite de Jornaleros de Redondo Beach v. City of Redondo Beach</u>, 657 F.3d 936, 942 (9th Cir. 2011).

2.      Injunction under 26 U.S.C. § 7402

The district courts have jurisdiction to issue, at the instance of the United States, orders of injunction as may be necessary or appropriate for the enforcement of the internal revenue laws, in addition to any and all other enforcement remedies of the United States in such courts or otherwise.

3.      <u>Injunction under 26 U.S.C. § 7407</u>

If the district court finds a tax return preparer has

(A)     Engaged in any conduct subject to penalty under section 6694

(understatement of taxpayer's liability by tax return preparer) or 6695

-8-

(assessable penalties upon preparation of tax returns for others), or

subject to any criminal penalty provided by this title;

(B)    Misrepresented his eligibility to practice before the Internal Revenue

Service, or otherwise misrepresented his experience or education as a tax

return preparer;

(C)    Guaranteed the payment of any tax refund or the allowance of any tax

credit; or

(D)    Engaged in any other fraudulent or deceptive conduct which substantially

interferes with the proper administration of the Internal Revenue laws;

and that injunctive relief is appropriate to prevent the recurrence of such conduct, it may

enjoin such person from further engaging in such conduct.

If the court finds that a tax return preparer has continually or repeatedly engaged

in any conduct described in subparagraphs (A) through (D) and that an injunction

prohibiting such conduct would not be sufficient to prevent such person's interference

with the proper administration of this title, the court may enjoin such person from acting

as a tax return preparer.

4.    Injunction under 26 U.S.C. § 7408

If the district court finds that any person has taken action or failed to take action

which is (1) subject to penalty under I.R.C. § 6700 (promoting abusing tax shelters),

6701 (aiding and abetting understatement of tax liability), I.R.C. § 6707 (failure to

furnish information of reportable transactions), or I.R.C. § 6708 (failure to maintain lists

of advisees), or (2) in violation of any requirement under regulations issued under

section 330 of title 31, United States Code (rules of practice before the Treasury

Department), and injunctive relief is appropriate to prevent recurrence of such conduct, the court may enjoin such person from engaging in such conduct or in any other activity subject to penalty under this title.

**B.      Plaintiff's Position**

Plaintiff argues:

1.      Unlawful Tax Plan Pursuant to I.R.C. § 7408

Defendant's tax plan, as defined below ("Plan"), is an abusive tax shelter, and Defendant should be permanently enjoined from promoting it.

**Defendant's Plan consists of**: Making representations about federal tax benefits or a tax treatment which Defendant knows or has reason to know are materially false and fraudulent and based thereon (1) organizing, promoting, and participating in a scheme whereunder individual personal service providers assign or invest income with wholly owned corporations, (2) claiming on the corporations' returns unlawful deductions for non-deductible personal expenses, (3) reporting the remaining income to the individual personal service providers as rental or royalty income, (4) not reporting the corporation's payments of the service providers' personal expenses as constructive dividends for which taxes are due, and (5) not reporting self-employment or social security tax liability on the personal service income mis-classified as rental or royalty income.

Defendant's Plan has been determined fraudulent by the California Board of Accountancy  and the United States Tax Court. Moreover, Defendant entered a guilty plea in the United States District Court for the District of Nebraska to aiding and abetting tax evasion in preparing tax returns for others using the fraudulent Plan. He is

-10-

collaterally estopped from re-arguing or re-litigating the issue of his guilt for such acts.

Certain of Defendant's clients who participated in the Plan also have pleaded guilty to tax evasion and paid restitution based upon federal tax returns prepared by Defendant.

Defendant's Plan has repeatedly and substantially interfered with the proper administration of the Internal Revenue laws by causing understatements of taxes due, failure to file returns when due, and failure to cooperate with the IRS.

### 2.   Preparation of Tax Returns for Others per I.R.C. § 7407

Defendant should be permanently enjoined from preparing federal tax returns for others.

Defendant, in pursuit of his Plan has (1) repeatedly prepared for others returns which understate taxpayer liability by taking unreasonable tax positions, and (2) prepared, assisted with, and filed tax returns, amended returns, and other related documents and forms knowing same will be used for material matters arising under internal revenue law and causing understatement of federal tax liabilities and avoidance of federal taxes due.

### 3.   Appearing by Power of Attorney per I.R.C. § 7402

Defendant should be permanently enjoined from appearing before the IRS by way of power of attorney.

Defendant, in pursuit of his Plan has (1) interfered with and delayed IRS investigations, (2) made false statements to IRS agents regarding examinations, (3) failed to provide requested records regarding the customers he represents, (4) failed to file required returns on customers' behalf, (5) advised his clients not to speak to IRS

agents, (6) filed frivolous "Forms 911" delaying IRS investigations, and (6) failed to notify his clients when his Plan was found to be unlawful by the Board of Accountancy, the Tax Court, and the Nebraska District Court.

The equities, though not implicated under section 7402 where there is a statutory basis for injunctive relief, nonetheless favor the Plaintiff and militate toward injunctive relief. By using Defendant's Plan, his clients have defrauded Plaintiff and deprived it of tax revenue. Many of Defendant's clients, following his advice, failed to file federal income tax returns and thereby became subject to penalties, interest and, in some cases, federal prosecution.

There is a reasonable likelihood that Defendant will continue promoting his fraudulent Plan absent injunctive relief because (1) he is highly educated, experienced, and has worked in the accounting and tax field since the 1970's, (2) he has profited significantly from his Plan, and (3) he continues to assert the legality of his Plan and make false statements about this case. Defendant has not taken responsibility for his actions. He blames others and denies his Plan is unlawful or abusive. He denies the applicability of this Court's preliminary injunction.

Only an injunction can protect the public and Plaintiff from Defendant.

**C.    Defendant's Position**

Defendant argues:

1.    No. Unlawful Tax Plan per I.R.C. § 7408

His tax method is not unlawful, but rather a commonplace, and widely affirmed, method of assigning personal service income to a professional service corporation and deducting expenses from that income.

His method of using "loan out" corporations was not found abusive by Judge Wanger during the preliminary injunction phase in this matter.

His Tax Court case did not involve use of the "corporate" form of operation. The outcome of that case does not support Plaintiff's claim to injunctive relief.

He is not responsible for his clients' improper deduction of personal expenses on corporate returns.

### 2.   No Collateral Estoppel

He is not precluded from re-litigating issues determined in his administrative, civil and criminal proceedings because (1) the legality of his tax method was not determined and (2) his criminal conviction is on appeal.

### 3.   Equities do not favor Plaintiff

The equities in this case do not favor Plaintiff. The facts do not establish "irreparable harm" and "inadequacy of remedies at law". Indeed, there has been no harm because Plaintiff has recovered tax deficiencies owed by Defendant's former clients.

### 4.   Defendant Lacks Access to Evidence in Opposition[3]

Defendant's incarceration has deprived him of "his own notes, analyses, work papers, and other documents" necessary to oppose Plaintiff's Rule 56 Motion. He thus lacks evidence necessary to mount an opposition as to, for example, Plaintiff's Undisputed Material Facts (UMF's) 25, 32, 37, 67, 86, 96, 99, 121, 122, 178, and 180, and as to unspecified issues relating to his clients' personal deductions.

---

[3] Defendant's motion for a "legal furlough" to gain access to such alleged evidence was denied without prejudice by the Court on October 11, 2012. (Order Den. Mot., ECF No. 234.)

-13-

1

### D.   Undisputed Facts

2

Plaintiff has submitted an extended list of undisputed material facts in support

3

of its Motion for Summary Judgment. Defendant, though filing opposition to the Motion

4

for Summary Judgment, has not disputed, in the manner required by Rule 56(c), the

5

6

materiality or truth of the facts enumerated by Plaintiff nor objected to or disputed the

7

evidence cited in support of them. If a party fails to address the moving party's

8

assertions of fact as required by Rule 56(c), the Court may order the moving party's

9

facts deemed admitted for purposes of the motion. Fed. R. Civ. P. 56(e)(2); Beard v.

10

Banks, 548 U.S. 521, 527 (2006). Plaintiff may not create a "genuine" issue of

11

"material" fact simply by making assertions in his  legal memoranda. Helmich v.

12

Kennedy 796 F.2d 1441, 1443 (11th Cir. 1986); see also Stallings v. Werner

13

Enterprises, Inc., 598 F.Supp.2d 1203, 1209 (D. Kan 2009) (blanket denial of moving

14

15

party's facts unsupported by reference to the record allows district court to deem facts

16

admitted on summary judgment); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-51

17

(1986) (a genuine issue does not exist despite the existence of an alleged factual

18

dispute if the evidence favoring the nonmoving party is merely colorable, or is not

19

significantly probative).

20

21

The Court has reviewed the facts submitted by Plaintiff, as outlined below, and

22

finds them supported by the evidence and without dispute and so deems them

23

established for purposes of this motion for summary judgment.

24

Baisden's Practice

25

Until his license was revoked by the California Board of Accountancy, Baisden

26

was a licensed California Certified Public Accountant. (UMF 1.) Until sentenced to

27

-14-

federal prison for tax evasion and aiding and abetting tax evasion, Baisden was a solo

practitioner in Bakersfield, California, who prepared tax returns for customers in

California and Nebraska. (UMF 2.) Baisden also worked with the Arcturus Corporation

which was incorporated in Nevada in 2002. Nevada Secretary of State records show

Susan Baisden-Koning, Baisden's sister, as the Secretary of Arcturus and her husband,

Michael Koning, as President and Treasurer. Baisden is shown as a contact for Arcturus

on the Arcturus website. (UMF 3.)

Baisden charged customers $4,000 to set up a corporation and also charged a

monthly retainer for his tax-preparation services. (UMF 113.) According to Baisden's

federal income tax return, in 2002 alone he received at least $156,800 in income from

customers who participated in his tax Plan. (UMF 4.)

Bianco

Baisden was the accountant for a North Platte OB-GYN practice. (UMF 6.)

Baisden marketed the fraudulent tax Plan to one of Koning's employees, Dr. Michael

Bianco, who worked at the North Platte OB-GYN with several other Baisden's

customers, including Dr. Trierweiler and Dr. Weaver. (Bianco Dep. 5-20.)

Dr. Bianco attended a meeting in Dr. Trierweiler's home where Baisden described

how the tax laws were not always clear and people could be "more aggressive in their

deductions" and advised that one "would benefit from having a corporation." (UMF 7.) At

a second meeting at Bianco's house, Baisden described the tax benefits of

setting up a corporation so that Bianco could deduct "cars, going out to eat, trips" as

business expenses. (UMF 8.) Baisden said that a corporation could be set up in Las

Vegas for a fee. (UMF 9.)

1
2
3
4
5
6
7
8

Baisden advised Bianco that his fee would be one-third of what Bianco saved in taxes. (UMF 11.) Because Baisden's estimated fee was $2,000 a month, Bianco understood that following Baisden's advice would enable him to save "about $6,000 a month" in taxes. (UMF 12.) Bianco's regular accountant had charged him "about $450" a year to prepare his taxes. (UMF 13.) In response to Bianco's questions, Baisden stated that his tax plan was legal because "tax laws in more cases than not are not specific." (UMF 14.)

9

<u>Kryzsko</u>

10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

Baisden marketed the fraudulent tax Plan to Shane Kryzsko, a nurse anesthetist who formerly worked for Koning. (UMF 15.) In June 2002, Kryzsko met with Baiden, who told her that he had formerly worked for Ernst & Young and that he had extensive tax knowledge. (UMF 16.) In the meeting, Baisden explained that he had a Plan to assist her in creating a Nevada corporation through which she could deduct personal expenses and reduce her tax liability. Baisden also said that by using his Plan, she could pay whatever taxes she wanted, depending on "how aggressive [she] wanted to be." (UMF 17.) Baisden said that the corporation should be set up in Nevada because Nevada laws prevent the disclosure of corporate ownership information. (UMF 18.) Baisden said that under his Plan, once the corporation was set up, Kryzko could mail him receipts and personal expense information, and Baisden would then deduct all of her personal expenses except food. (UMF 19.) Baisden said that by implementing this Plan, Kryzsko could pay as little as $3,000 a year in tax, even though Baisden knew that Krysko was earning approximately $150,000 per year. (UMF 20.) Baisden advised that he charged an initial fee to establish the corporation plus a $1,500 retainer each month. (UMF 21.)

Baisden justified the fee by saying his plan could save Kryzsko between $20,000 and $25,000 in taxes each year. (Id.)

Kryzsko told Baisden that she was not interested in his services because she was "skeptical about the legality of the Plan." (UMF 22.)

McKeag

Baisden prepared the 2002 federal income tax and corporate tax returns for Nebraska anesthesiologist Dr. McKeag, a former co-worker of Dr. Koning. (UMF 23.) McKeag was introduced to Baisden through Dr. Koning, who told him "the best thing he could ever do for us is to connect us with his accountant" because "he could save us money and taxes" by setting "us up with a corporation that would reduce our tax burden." (UMF 24.) In May or June of 2002, Baisden told McKeag that he could create a stock corporation, but that it could not have anything to do with medicine or the practice of anesthesia and that the corporation could be "linked to us by one of our social security numbers . . . [so] essentially there wouldn't be any tie to us directly as owners of the corporation." (UMF 25.) Baisden said that setting up a corporation "would allow us to deduct numerous business expenses and therefore decrease our taxable income." (UMF 26.)

Baisden told McKeag that the corporation had to be set up in Nevada because "the IRS had no access to corporate documents in the state of Nevada." (UMF 27.) Baisden advised  McKeag he would have seven years after setting up the corporation to come up with an actual business undertaking and he encouraged McKeag to consider having the corporation conduct real estate development business. (UMF 28.) McKeag understood Baisden's statement to mean that he did not have to have any

-17-

business activity at the time he formed the corporation. (UMF 29.) Baisden told McKeag that all expenses "other than your mortgage, your food, and your clothing" could be deducted through the corporation. (UMF 30.) Baisden also told McKeag that if the corporation owned assets, such as a car, and they are part of the business, they could be deducted. (UMF 31.)

McKeag agreed to hire Baisden, and paid him $4,000 to set up the corporation (known as Oceana Blue Corporation) and $1,000 a month for his accounting services, including audit representation if McKeag was audited by the IRS. (UMF 32.) For the year 2002, Baisden prepared federal income tax returns for Burt and Pamela McKeag and their wholly owned corporation, Oceana Blue Corporation. (UMF 33.) On the 2002 return, Baisden reported that Burt McKeag had assigned $93,685 of his anesthesiology income to Oceana Blue, a real estate business which had no deductible expenses related to the compensation of officers or for salaries and wages. Baisden also reported that the corporation had incurred deductible business expenses for equipment rental, utilities, insurance, lodging, professional services, and vehicle and office expenses. (UMF 34; McKeag Dep. 43-61.) Baisden did not report on the tax returns that Oceana Blue was a personal services corporation. (UMF 35.) On the McKeags' individual tax return for 2002, Baisden reported that the McKeags had earned $47,307 from royalty income, but had not earned any income from constructive dividends or non-employee compensation for Dr. Burt McKeag's work for the Oceana Blue Corporation. (UMF 36.)

After hiring Baisden, McKeag raised several questions with Baisden, including whether it was legal to put income earned from practicing anesthesia into a stock corporation and reclassify it as other income, and, how "it could be that my income from

the corporation was considered a royalty payment." (UMF 38.) Baisden told McKeag that the he could classify his income as royalties because it is "based upon the idea generated by the person getting the royalties." (UMF 39.) When McKeag told Baisden that he did not want his income classified as royalties because it would not be subject to social security, Baisden said "he would adjust things so that we would make at least partial contributions to Social Security and Medicaid." (UMF 40.)

McKeag became convinced that "the advice we had been given was not good advice . . . [specifically] the [stock] corporation versus the professional corporation, the classification of income as royalties, [and] the deduction of [personal] expenses". He hired a new accountant, filed an amended return for 2002, and ultimately paid additional $70,000 in tax. (UMF 41.) McKeag told Baisden in October 2003 that he did not want his services anymore because "we did not think that his accounting was accurate or legal." (UMF 42.) Baisden replied that "it was, in fact, legal and there was absolutely nothing wrong with it," and that "we were going to cost ourselves a lot of money" using a new accountant. (UMF 43.)

After McKeag terminated Baisden, he hired Robert C. McChesney, a CPA and certified fraud examiner with over 40 years of experience as an accountant, to prepare amended returns and to handle an IRS audit. (UMF 44.) McChesney first learned of Baisden when McKeag came to his office soliciting a second opinion on his tax returns. (UMF 45.) McKeag conveyed to McChesney that he had been instructed by Baisden that he could pay any all personal expenses through his corporation and that they would end up being deducted, and that income drawn from his corporation would be rental income, not wages, and thus exempt from FICA taxes. (UMF 46.) McChesney

concluded that McKeag's income did not qualify as royalty income; it was a return for services provided or earned income. (UMF 47.) McChesney also concluded that as a medical practitioner in Nebraska, McKeag was required to incorporate as a professional corporation under Nebraska law, and that practicing medicine under any other type of corporation was illegal. (UMF 48.)

McChesney prepared an amended federal income tax return for McKeag for 2002. McChesney stated that "in the amended return we took the position that the corporation was invalid since it was not authorized to practice medicine in Nebraska. We completely ignored it. We gave all the income to Dr. McKeag because that was in accordance with the agreement he had with Dr. Koning. We also did not take away any expenses that were not proper deductions for Dr. McKeag's medical practice. And we paid social security tax on the income." (UMF 49.) McChesney also noted that "there were numerous deductions for personal expenses that were deducted on the original corporation return. We chose to ignore those completely," including claimed deductions for house utilities and personal vehicles. (UMF 50.) McChesney also "determined there was no logic, no substantiation, no merit, no position we could take that would [as to income McKeag received for services as an anathesiologist] allow that to be treated as a royalty."(UMF 51.) In 2004, the McKeags filed an amended federal income tax return, not prepared by Baisden, stating that the original Oceana Blue tax return was being amended "because the entity was found to be invalid and the income and expense originally reported by this entity is now reported by the taxpayer and sole shareholder on this amended form 1040." The McKeags claimed all of the income originally attributed to Oceana Blue on their amended individual tax return, and reported

no income for Oceana Blue on its amended tax return, stating that the corporation was not valid in Nebraska for several reasons, including that it was not established as a professional corporation and income was not legally assigned to the corporation. (UMF 37.)

During McChesney's deposition, Baisden stated that "other people got together and alleged that Dr. Koning was cheating on his taxes in some way to get his [Dr. Koning's] contract terminated with the Hospital" and "that's why I believe we're here today dealing with this because of the allegations that they had made to the IRS." (UMF 52.)

Hastings

For tax year 2002, Baisden prepared federal tax returns for William and Vicki Hastings and [their corporation] Amethyst Sands, Inc. (UMF 53.) Hastings heard of Baisden through Dr. Koning. (UMF 54.) Hastings agreed to hire Baisden to prepare his federal tax returns and to set up a corporation in Nevada. (UMF 55.) Baisden told Hastings that he could "save taxes by it [the corporation] being in Nevada as opposed to Nebraska." (UMF 56.) Hastings named the corporation Amethyst Sands. (UMF 57.) Baisden recommended that Hastings look into buying real estate through the corporation. (UMF 58.)

After Amethyst Sands was incorporated, Hastings was paid by Amethyst Sands the same income as he had received before, but the amount of his monthly checks increased because Hasting was no longer a W-2 employee and taxes were not taken out of his pay. (UMF 59.) The money Hastings received from Amethyst Sands was deposited in his personal bank account. (UMF 60.) Hastings paid Baisden $3,000 per

month for his services and money for travel between California and Nebraska. (UMF 61.)

Baisden prepared Hastings' 2002 federal income tax return. (UMF 62.) Baisden also prepared the 2002 return for the Amethyst Sands Corporation. (UMF 63.) Baisden reported a rent expense of $69,750 on Amethyst Sands' 2002 corporate tax return without discussing this item with Hastings or having any basis for the expense. (UMF 64.) Baisden also reported various personal expense deductions on Amethyst Sands' 2002 corporate tax return, including deductions of $8,636 for advertising and $20,581 for repairs and maintenance. (UMF 65.) Baisden also falsely claimed that Amethyst Sands was engaged in the real estate business. (UMF 66.) Baisden also claimed depreciation deductions on Amethyst Sands' 2002 corporate tax return even though the corporation had no assets. (UMF 67.)

Hastings urged Baisden "on numerous occasions" to prepare his 2003 federal income tax return but Baisden said it was "no big deal." (UMF 68.) Baisden also told Hastings that "it would be advisable not to file the income taxes, and that you were eventually going to win the case and it would all work out to do it under the same mechanism." (UMF 69.) Hastings also paid Baisden to prepare his 2004 federal income tax return, which Baisden failed to do. (UMF 70.) Hastings made estimated tax payments based on advice he received from Baisden. (UMF 71.)

Hastings later filed an amended tax return for 2002 using a different preparer. (UMF 72.) On Hastings' 2002 amended federal income tax return, he combined the income that he had previously reported to the Amethyst Sands Corporation and reported that income to himself individually. (UMF 73.) Hastings did so because the IRS had determined that Amethyst Sands was not a legitimate corporation and owed $19,660

additional taxes for 2002. (UMF 74.) Hastings' new accountant also filed tax returns for 2003, 2004, and 2005. (UMF 75.)

Geilenkirchens

Evan Geilenkirchen was a nurse anesthetist who worked with Dr. Koning at Anesthesia Consultants of Nebraska ("ACN") in North Platte, Nebraska. (UMF 78.) Geilenkirchen was introduced to Baisden by Dr. Koning, who said that Baisden "had done a good job for him and saved him on taxes." (UMF 79.) In 2002, Dr. Koning met with Evan Geilenkirchen at work and asked if Geilenkirchen was interested in working with Baisden. Baisden later told the Geilenkirchens that by setting up a corporation, they could save money on their taxes and that it would offer protection from lawsuits. (UMF 84.)

Baisden had the Geilenkirchens provide him the name they wanted for their corporation, and he incorporated PTCW for them on February 7, 2003. (UMF 85.) Baisden had talked to the Geilenkirchens about how to set up a Nevada corporation. (UMF 80.) Baisden set up PTCW as a Nevada corporation and instructed the Geilenkirchens to

deposit income from their employer into the corporate bank account and have the corporation then pay the Geilenkirchens. (UMF 81.) Baisden also told the Geilenkirchens that they could "deduct certain expenses" through the corporation and that because the corporation was in Nevada, it was "protected as far as information sharing," protected from the government, the IRS, "seeing your financial activities." (UMF 82.) The Geilenkirchens were "a little skeptical at first," questioned Baisden "repeatedly about if everything was legal," and were told by Baisden after receiving the first year's refund

that "See, my plan does work." (UMF 83.)

Baisden prepared the federal income tax returns for Evan and Jane Geilenkirchen and for their wholly owned corporation, PTCW, for the year 2002. (UMF 77.) On the Geilenkirchens' return for 2002, Baisden reported that Evan Geilenkirchen was an investor, rather than a nurse anesthetist. (UMF 87.) Geilenkirchen did not have any investments. (Id.) Baisden also filed the 2002 corporate return for PTCW in May 2003 even though he knew the company had not been incorporated until February 7, 2003 and thus had not been in existence during 2002. (Id.) Baisden also reported that Geilenkirchen had assigned his entire income of $176,164 from [ACN] to the PTCW corporation and that PTCW was in the real estate business. (UMF 88.) Baisden did not report any other income to PTCW other than Geilenkirchen's [ACN] income. (Id.) On the returns he prepared for PTCW, Baisden reported a total of $150,903 as ordinary business expense deductions, which included amounts for repairs, rent, depreciation, advertising, meals and entertainment, contract labor, insurance, supplies, and vehicle and office expenses. (UMF 89.) Baisden reported income to the Geilenkirchens for 2002 only from royalties and refunds of taxes. (UMF 90.) Baisden did not report any income to the Geilenkirchens as  wages, non-employee compensation, or as constructive dividends. (Id.)

In addition, the Geilenkirchens retained and paid Baisden to prepare tax returns for the years 2003 and 2004. (UMF 91.) Throughout 2003 and 2004, the Geilenkirchens periodically sent Baisden their checking account statements, credit card statements, and copies of Quicken™ spreadsheets listing their expenses and income. (UMF 86.) After the return-filing deadlines passed, Baisden told the Geilenkirchens that he had not filed

their returns because he was awaiting a determination from the IRS regarding the Konings' tax returns. (UMF's 91, 133.) When Baisden failed to prepare the returns by their required filing dates, the Geilenkirchens retained a new accountant to prepare and file them. (UMF 91.) Baisden told the Geilenkirchens that though he had not filed their tax returns, they would not suffer any overall harm because of the amount they were saving in taxes. (UMF 92.) Despite the unfiled returns, Baisden advised the Geilenkirchens to make specified amounts of estimated tax payments. (Id.) Pursuant to that advice, the Geilenkirchens made estimated tax payments of $1,300 for the year 2003. (Id.)

When the Geilenkirchens were audited by the IRS, they contacted Baisden, who told them that the returns he filed were correct. (UMF 93.) Baisden also told them that IRS was on a "witch hunt" regarding returns he prepared. (UMF 94.) Baisden cancelled as many as eight appointments with the revenue agent auditing the Geilenkirchens' returns. (UMF 95.) Baisden never showed up for any meetings with the IRS, and the IRS did not receive any documents from the Geilenkirchens until the IRS issued a summons directly to the Geilenkirchens. (UMF 96.)

Since Baisden failed to represent the Geilenkirchens when they were audited by the IRS, they had to hire a new CPA and an attorney and paid $80,000 for their services. (UMF 97.) After meeting with the IRS to discuss their tax liability for 2002, the Geilenkirchens agreed to assessment of additional tax in the amount of $25,713. (UMF 99.)

Trierweilers, Weavers, Snoozys

Baisden prepared federal income tax returns for Michael and Deanna Trierweiler,

Walter and Deborah Weaver, Donald and Kathryn Snoozy and for their wholly owned corporations, Red Desert Resources Corporation, Axhandle Corporation, and Charpup Corporation, respectively. (UMF 100.)

On the corporate tax returns Baisden reported that all three corporations were in the real estate business and had no deductible expenses related to the compensation of officers or for salaries and wages. (UMF 101.) Baisden reported that Michael Trierweiler, Walter Weaver, and Kathryn Snoozy had assigned their incomes as medical professionals to their corporations. (Id.) Baisden reported no other income to any of the corporations. (Id.) Baisden did not report that Red Desert, Axhandle, or Charpup were personal services corporations. (Id.)

On the federal income tax returns he prepared for the three couples, Baisden reported that Kathryn Snoozy, Walter Weaver, and Michael Trierweiler were employed as "investors." In actuality, Trierweiler and Weaver were physicians and Snoozy was a nurse anesthetist. (UMF 103.)

On February 2, 2010, an information was filed in the District of Nebraska charging Kathryn and Donald Snoozy with the willful failure to file federal tax returns for 2003 and 2004. (UMF 104.) On February 8, 2010, Kathryn and Donald Snoozy signed Petitions to Enter Pleas of Guilty. (UMF 105.) As part of their sentencing, Kathryn and Donald Snoozy were ordered to pay $77,214 in restitution to the Internal Revenue Service. (UMF 106.)

On April 28, 2010, an information was filed in the District of Nebraska charging Michael and Deanna Trierweiler with tax evasion for the 2003 tax year. (UMF 107.) On April 28, 2010, Michael and Deanna Trierweiler signed Petitions to Enter Pleas of Guilty.

(UMF 108.) As part of their sentencing, Michael and Deanna Trierweiler were ordered to pay $258,154 in restitution to the Internal Revenue Service. (UMF 109.)

On April 28, 2010, an information was entered charging Dr. Walter Weaver and Dr. Deborah Weaver, husband and wife, with willfully attempting to evade or defeat tax owing for 2003 in the amount of $128,727. (UMF 110.) On April 28, 2010, Dr. Walter Weaver entered a guilty plea to Count I of the Information, charging him with willfully attempting to evade or defeat tax owing for 2003. (UMF 111.) As part of their sentence, the Weavers were order to pay $224,365.57 in restitution to the IRS. (UMF 112.)

Koning and Baisden

Under Baisden's Plan, corporations earned income through the provision of medical services and "from development real estate through a joint venture." (UMF 115.) According to Baisden, the "corporation . . . enters into a joint venture to carry on an additional business activity, which is generally the development of real estate." (UMF 116.) Under the joint venture, monthly rent is paid to the individual by the corporation. (UMF 117.)

From 1999 through 2004 Baisden was the accountant for ACN, a corporation co-owned and operated by his brother-in-law, Dr. Michael Koning, in North Platte, Nebraska. (UMF 118.) Baisden consulted with and provided advice to Dr. Koning regarding the incorporation of the Bioventures Corporation. (UMF 119.) Baisden agreed to pay Koning a referral fee for any North Platte customers he acquired. (UMF's 114, 120.) Dr. Koning set up four Nevada corporations – FT, CW, Stratus and Granite Corporation – based on Baisden's advice. (UMF 121.) The incorporation papers were prepared by attorney Warren Wood based on Baisden's advice. (UMF 122.) Deborah

-27-

Fields, Koning's sister, served as the resident agent for several of Dr. Koning's corporations. (UMF 123.) On the advice of Baisden, Koning set up Bioventures so that it could receive the income of ACN. (UMF 124.) All income that Koning previously earned through ACN for his services as an anesthesiologist was now earned by Bioventures. (UMF 125.)

Dr. Koning received income in the amounts of $634,557, $945,500, and $893,234 for the years 1999 through 2001. (UMF 126.) In 1999, 2000, 2001, and 2002, Baisden prepared federal tax returns for Bioventures Corporation on which he reported that Dr. Koning's income from ACN was assigned to Bioventures. (UMF 127.) Baisden did not report any gross receipts to Bioventures other than Koning's compensation from ACN. (Id.)

When asked why his corporation received income from Dr. Koning's medical practice [ACN], Dr. Koning declined to answer on Fifth Amendment grounds. (UMF 128.)

At the preliminary-injunction hearing, Baiden admitted into evidence a purported Joint Venture Agreement between Koning and Bioventures.(UMF 129.) At the close of the preliminary-injunction hearing, the Court stated that "This [Joint Venture Agreement] doesn't say anything . . . Respectfully, it's gobbledygook." (UMF 130.)

On the Konings' federal income tax returns that Baisden prepared for tax years 1999 through 2003, Baisden reported Dr. Koning's occupation as "investor." (UMF 131.) From 1999 through 2003, Dr. Koning worked full-time as an anesthesiologist and was the President of ACN. (UMF 131.) On Bioventures' federal income tax returns that Baisden prepared for tax years 2000 through 2003, Baisden reported the following personal expenses as ordinary business expense deductions: (1) the cost to purchase

and store an airplane owned by the Konings; (2) lawncare expenses for the Konings' residence in North Platte, Nebraska; (3) construction and other costs for the Konings' residence in Montana; (4) utilities for the Konings' residence in Nebraska; (5) expenses for the Konings' personal vehicles; (6) the cost of homeowners' insurance for the Konings' residence in Nebraska; and (7) various costs from the Konings' personal credit cards. (UMF 132.)

Baisden told Koning on multiple occasions, including as late as January 2008, that he should not file any federal income tax returns until the IRS had made a determination regarding Baisden's tax strategies. (UMF 134.) Baisden advised Koning to not speak with the IRS directly. (UMF 135.) On March 20, 2009, Dr. Koning and his wife, Susan Baisden-Koning, were indicted on multiple felony counts of tax evasion and aiding and abetting tax evasion. (UMF 136.) On March 25, 2011, Dr. Koning and Susan Baisden-Koning entered guilty pleas to Count IV of the Indictment, charging that they willfully attempted to evade and defeat their federal income tax owing for 2003 in the amount of $236,217. (UMF 137.) As part of their sentencing, Dr. Koning and Susan Baisden-Koning were ordered to pay restitution of $989,531 to the Internal Revenue Service. (UMF 138.)

Baisden set up the Arcturus Corporation, whose business purpose according to Koning, one of Arcturus' corporate officers, was to buy shares in medical practices. (UMF 139.) Baisden also characterized Arcturus's primary purpose as the purchase of shares of stock in existing medical practices. (UMF 140.) Koning stated that Arcturus's purpose was to "buy an interest in the income producing potential of a medical practice." (UMF 141.) Arcturus promised at its website that "[e]ffective and legal tax reduction and

asset protection can be yours without going offshore. We can help you restructure your income in order to substantially reduce your tax liability." (UMF 142.) Arcturus marketed itself to "professionals and business owners with incomes greater than $200,000 per year," and directed interested persons to contact Baisden or Koning. (UMF 143.) After Arcturus was incorporated, Koning and Baisden began developing the model to buy interests in medical practices. (UMF 144.)

Koning also introduced various medical professionals in North Platte, Nebraska to Baisden, including Kathy Snoozy and Evan Geilenkirchen, so that they could use Baisden's accounting services and possibl[y] invest in Arcturus. (UMF 145.)

Koning also approached Kryzsko, telling her that she could sell shares of the corporation that Baisden set up to Arcturus, with an option to buy back the shares. Baisden said that this investment Plan would produce tax benefits for both Koning and Kryzsko. Kryzsko was "similarly skeptical about Baisden's new tax scam and declined to participate." (UMF 146.) Arcturus later purchased an interest in the medical practices of Kathy Snoozy and Dr. Hastings. (UMF 147.) For these transactions, the stock purchase agreements were drafted by Baisden and signed by Koning. (UMF 148.) Koning relied on Baisden's advice in forming the belief that he had the legal authority to purchase an interest in a sole proprietorship. (UMF 149.) Koning owned Arcturus but agreed to pay Baisden a share of any earnings. (UMF 150.)

Baisden also spoke to Hastings about participating in the Arcturus company. (UMF 151.) Hastings participated in the Arcturus transaction and had part of his income deferred to the Arcturus Corporation. (UMF 152.) Hastings understood that Baisden and Koning would get a share of his money as fees or expenses. (UMF 153.) Hastings

contributed approximately $200,000 to Arcturus in 2003. (UMF 154.) Hastings contributed money to Arcturus by having a check from ACN sent directly to Arcturus. (UMF 155.) The money that Hastings paid to Arcturus was treated by Baisden as pre-tax income, meaning that Baisden did not report the amount that Hastings paid to Arcturus as Hastings taxable income. (UMF 156.) Hastings was later reimbursed for the money he put into Arcturus. (UMF 157.) Hastings has no knowledge of whether monies he put into Arcturus were actually invested; he did not receive any statements, interest, or other return on his investment. (UMF 158.) Baisden also stated that "Hastings would have the ability to take that money out and use it for whatever purpose once it went over to Arcturus." (UMF 159.)

The IRS concluded that Arcturus was not a business engaged in the bona fide purchase of accounts receivable but "just Dr. Hastings [giving] money to Arcturus" without the money "reported anywhere as income." (UMF 160.)

Coopers

Baisden prepared federal income tax returns for Joel and Deborah Cooper for the year 2002 as well as the corporate income tax returns for Joel N. Cooper Physical Therapist, Inc. (UMF 161.) On Cooper's corporation's tax returns, Baisden reported ordinary business deductions for items including the Coopers' golf course expenses, country club membership, home utilities, pool expenses, the majority of their car expenses, the cost of a van, and portions of the cost of constructing their home. (UMF 162.) Baisden did not report that the corporation had paid any constructive dividends or non-employee compensation to the Coopers. (UMF 163.) For the years 2002 and 2004, Baisden reported that the Coopers had only a small amount of wages and had earned

the great majority of their income from rent from two medical properties owned by the Coopers. (Id.)

The IRS conducted an examination of the Coopers' tax liability and met with Cooper and Baisden. (UMF 164.) After the meetings, the IRS determined that many of the deductions Baisden had reported for business expenses were actually for non-deductible personal expenses and that the amount of the rent claimed as income on the federal income tax returns did not correspond with the value of the property or a legitimate rental fee. (Id.) After an audit, the IRS determined that the Coopers' adjusted gross income for 2002 was $202,127, not $100,970 as reported by Baisden, and assessed additional tax of $28,983 and accuracy penalties of $5,797 for 2002, and also assessed additional taxes and penalties for 2003 and 2004. (UMF 165.)

Swartz and Erale

Baisden prepared federal income tax returns for Daniel Swartz and Jennifer Erale for the years 2002 through 2004 reporting losses from the operation of a farming business. (UMF 166.) On the 2002 return, Baisden reported a $38,354 farm loss. (Id.) After discussing the taxpayers' purported business activity with Baisden, the IRS determined that Baisden had claimed false farm losses on the returns because although they owned a horse, the horse was not trained, the taxpayers derived no income from the horse, and had no evidence to support the business use of the animal. (UMF 167.)  The taxpayers ultimately agreed to pay additional tax and accuracy-related penalties for 2002 through 2004, and they have made payments to the IRS of $19,443, $14,005, and $17,664. (UMF 168.)

///////

Teleses

Baisden prepared federal income tax returns for Anthony and Kimberly Telese and their corporation Anthony Telese Company, Inc., for the years 2002 through 2004. (UMF 169.) On the Teleses' individual federal income tax returns, Baisden reported that they had earned the vast majority of their income from rent. (Id.) Anthony Telese worked full time for his engineering business. (Id.) After neither Baisden nor the Teleses provided a rental agreement or documentation to support the claimed rent in response to IRS inquiries, the IRS conducted research to determine a reasonable rent for the Teleses' property which was used by Telese's engineering business. (UMF 170.) The IRS found that the amount Baisden reported as rent was not consistent with rental rates for Bakersfield, California for the property. (Id.) On the federal tax returns Baisden prepared for the Teleses' corporation, Baisden reported ordinary business expense deductions for items including the cost of a motorcycle, another personal vehicle, utility payments and other expenses. (UMF 171.)

The IRS audited the 2002 return prepared by Defendant and found adjusted gross income should have been $104,881, not $54,214 as reported by Defendant. (UMF 172.) The IRS assessed an additional $9,387 in tax plus accuracy penalties of $1,877.40, which the Teleses paid. (UMF 173.)

Ghyselincks

Baisden prepared a federal income tax return for Joseph and Rhonda Ghyselinck for the year 2002, and for their corporation, Chuck's Automotive. (UMF 174.) On the Ghyselincks' individual federal income tax return, Baisden reported that the Ghyselincks had earned the vast majority of their income from rent, even though Joseph Ghyselinck

worked full-time in his automotive business. (Id.) On the federal tax return Baisden prepared for Chuck's Automotive, Baisden reported ordinary business expense deductions for items including medical expenses, life insurance, car expenses, and for the repair of a recreational vehicle. (UMF 175.)

After the IRS met with the Ghyselincks and a new accountant in 2005, the Ghyselincks agreed to reallocate $24,000 of the amount Baisden reported as rent to salary to Joseph Ghyselinck. (UMF 176.) The Ghyselincks agreed to the disallowance of some of the expenses Baisden reported as business expense deductions, and agreed to additional taxes of $2,316 individually as well as additional tax to their corporation of $8,765. (Id.)

IRS Action; Baisden Response

In 2004, the IRS opened an examination to determine whether Baisden was subject to penalty under I.R.C. §§ 6700, 6701, and 6694, or subject to an injunction under I.R.C. §§ 7402, 7407, and 7408 in 2004. (UMF 177.) On October 26, 2004, Baisden was notified that he was under investigation. (Id.)

Baisden declares that several IRS agents in California informed him that his tax practice was not abusive and that a manager in California had requested that an IRS agent stop auditing Baisden's customers. (UMF 178.) Neither the IRS agent nor his manager made any such statements. (Id.)

On March 8, 2007, following the two-day hearing on the preliminary injunction motion during which the Court stated that it would issue a partial injunction, Baisden sent e-mails to customers falsely stating that "[t]he result is that the Government did NOT get an injunction. (UMF 179.) This implies that your audit would have been resolved in your

favor if you had only waited patiently." (Id.)

In customer examinations, Baisden has failed to timely provide all of the documents the IRS requested by information request and by summons. (UMF 180.) On at least one occasion, Baisden told customers that they should do nothing in response to the IRS's inquiries, that the IRS would ignore their lack of response, and that the IRS was engaging in a "witchhunt." (Id.)

One revenue agent stated that Baisden "has never provided anything that we have ever requested. A few general ledgers once in a while. Has not had the taxpayers respond in a prompt and timely manner." (UMF 181.)

In four instances, the IRS issued summonses directly to his clients after Baisden refused to provide the requested documents and appear for meetings with IRS agents. (UMF 182.) Only after the clients themselves received summonses did they provide the requested documents and testimony. (Id.)

During customer examinations, Baisden has filed IRS Forms 911 claiming that the IRS summonses were causing his customers a hardship. (UMF 183.) The IRS Taxpayer Advocate's office determined that none of the forms Baisden submitted had merit. (Id.) Baisden's filing of the Forms 911 caused interruptions to IRS investigations during the pendency of the taxpayer advocate investigations. (Id.)

In opposing the United States' preliminary injunction motion, Baisden accepted no responsibility for his actions and asserted instead that the so-called "scheme" alleged by the United States is "the common place use of a corporation by a professional to sell his or her services, the "sham" corporations are duly organized and operating stock corporations operated by professionals, the "assignment" of

the client's income is the billing for and receipt of income for the service rendered

by the professional who owns the corporation, and the "unlawful deductions" are

in fact expenses subject to proof that they are deductible under IRC 162 or 212. (UMF

184.)

After the California Board of Accountancy brought suit against Baisden to revoke

his CPA license, on November 26, 2007, the California Board of Accountancy

adopted an administrative law judge's findings and revoked Baisden's CPA license.

(UMF 185.) On January 4, 2008, the California Board of Accountancy rejected Baisden's

motion for reconsideration and permanently revoked his CPA license. (UMF 186.)

Criminal Conviction and Sentence

On March 20, 2009, Baisden was indicted in the District of Nebraska on several

charges relating to his return preparation. (UMF 187.) Count IV charged him with

violating 26 U.S.C. § 7201 (attempt to evade or defeat tax) and 18 U.S.C. § 2 (aiding

and abetting tax evasion). (Id.) On October 3, 2011, Baisden pleaded guilty to Count IV

of the Indictment. (UMF 188.) At the plea hearing, Baisden admitted that he entered the

plea "to accept responsibility for my behavior." (UMF 189.) At the plea hearing,

Baisden's factual basis for the plea was that he "assisted Michael and Susan Koning to

evade income tax for the calendar year 2003. I met with the Konings ma[n]y times in

Nebraska and willfully took steps to complete their 2003 federal tax return." (UMF 190.)

Defendant pleaded guilty to charges he wilfully attempted to evade and defeat

taxes by concealing income, placing income and property in Dr. Koning's corporations,

and materially misrepresenting income and expenses on the Konings 2003 individual

and corporate tax returns. Baisden, 4:09-cr-03031; ECF No. 283; UMF's 187, 188, 191.

On January 31, 2012, Baisden was sentenced to 37 months in prison and was ordered to report to the U.S. Bureau of Prisons within 120 days. (UMF 191.) On or about February 3, 2012, Baisden informed Pretrial Services that he had applied for and been issued a passport and had plans to travel to India on or about February 7, 2012 for employment purposes. (UMF 192.) Baisden's planned travel was in violation of the conditions of supervised release dated April 30, 2009, under which Baisden was required to surrender his passport and not leave California. (UMF 193.) Because Baisden had violated his conditions of release and was in danger of becoming a fugitive, a bench warrant was issued and Baisden was ultimately placed under arrest. (UMF 194.)

Baisden Denial of Responsibility

Despite his guilty plea and the guilty pleas of his customers, Baisden continues to declare his innocence at a website entitled "Lowell Baisden and the DOJ: A True and Complete Story." At this website, Baisden presents what he says is the "true and complete story" that his former customer McKeag and McKeag's new accountant McChesney conspired . . . to take away his accounting work by reporting Dr. Koning to the IRS." (UMF 195.) Baisden also states at the website that he has sued McKeag and others for "business interference and conspiracy" (UMF 196), and that the Department of Justice has been unable to enjoin him: "Section 6700 of the Internal Revenue Code provides the IRS with a way to list certain tax methods as ATAT's and permanently bar the people involved, deemed promoters, from tax preparation by filing a lawsuit against these so-called promoters in the United States District Court. That is what the IRS tried to accomplish here, but failed in regard to

Baisden." (UMF 197.)

**E.    Analysis**

Plaintiff seeks to permanently enjoin Defendant from (1) promoting his tax Plan and in connection therewith from making false or fraudulent representations about federal tax benefits or treatment, and engaging in any other activity subject to penalty provisions in the I.R.C. (I.R.C. § 7408), (2) preparing tax returns for others (I.R.C. § 7407), and (3) appearing as a power of attorney before the IRS (I.R.C. § 7402).

1.    Fair Warning Notice

As a procedural matter, it appears Plaintiff failed to provide Defendant with the "fair warning" notice required pursuant to Woods v. Carey, 684 F.3d 934 (9th Cir. 2012) and Rand v. Rowland, 154 F.3d 952 (9th Cir. 1998). To the extent this was error, it is harmless in the circumstances of this case.

It is not clear that any such warning was required in this matter. The requirement for fair warning notice had its genesis in pro se civil rights litigation challenging prison conditions. Defendant was not a prisoner when this case commenced. He is not prosecuting a civil rights action over prison conditions.

Defendant has not in any event been prejudiced by lack of fair notice warning. His Opposition papers and Motion for Summary Judgment demonstrate awareness of and compliance with all the requirements described in the warning.

Finally, there are no facts in this case that would entitle Defendant to relief beyond any given here. "[T]he lack of [fair warning] notice can not be harmful if the record discloses that the pro se prisoner can not prove any set of facts which would entitle him or her to relief . . . . " Woods, 684 F.3d 934, 941, citing Rand, 154 F.3d at 962

n.9.

2.   Inaccessible Evidence

Defendant argues his incarceration has deprived him of "his own notes, analyses, work papers, and other documents" necessary to his opposition under Rule 56.

If a party opposing a motion for summary judgment shows by affidavit or declaration that, for specified reasons, it can not present facts essential to justify its opposition, the court may (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order. Fed. R. Civ. P. 56(d).

The test used to determine the sufficiency of an affidavit under Rule 56(d) asks whether the affidavit states the nature of the uncompleted discovery; how the facts sought are reasonably expected to create a genuine issue of material fact; what efforts the affiant has made to obtain those facts; and why those efforts were unsuccessful. G-I Holdings, Inc., v. Baron & Budd, 218 F.R.D. 409, 413 (S.D.N.Y. 203). The opposing party must state with some precision what material is sought, Nash v. Vancouver Police Dept., 457 Fed.Appx. 651, 652-53 (9th Cir. 2011), and exactly how that material will help in opposing summary judgment. Daul v. PPM Energy, Inc., 267 F.R.D. 641, 649 (D.Or. 2010), aff'd 444 Fed. Appx. 147 (9th Cir. 2011). The opposing party must show facts indicating a likelihood that controverting evidence exists as to a material fact. Tatum v. City & County of San Francisco,  441 F.3d 1090, 1101 (9th Cir. 2006).

Defendant does not provide an affidavit or declaration in support of his request for relief based upon unavailable evidence. He simply refers to the existence of broad

categories of unidentified information without explaining how the information might assist him in rebutting or contesting Plaintiff's facts.[4]

The Court finds Defendant has not made a showing of unavailable facts sufficient for relief under Rule 56.

### 3. I.R.C. § 7408 Injunction Against Abusive Tax Plan Should be Granted

Plaintiff seeks to enjoin Defendant from promoting his tax Plan, from making false or fraudulent representations about federal tax benefits or treatment, and from engaging in any other activity subject to I.R.C. penalty provisions.

A court has discretion to grant injunctive relief. U.S. v. Cruz, 611 F.3d 880, 887, (11th Cir. 2010). I.R.C. § 7408 authorizes the United States to obtain an injunction if the court finds (1) that the person has engaged in "specified conduct," and (2) that "injunctive relief is appropriate to prevent recurrence of such conduct."

As relevant here, "specified conduct" is "any action, or failure to take action," which is subject to penalty under I.R.C. § 6700. Generally speaking, I.R.C. § 6700 requires that the government prove that the defendant was involved in an abusive tax shelter and that he knowingly made false statements about the tax benefits investors would receive if they participated in it. United States v. Raymond, 228 F.3d 804, 811 (7th Cir. 2000); see Gates v. United States, 874 F.2d 584, 586 (8th Cir. 1989).

Courts applying I.R.C. § 6700 have identified four essential elements of it that the government must prove: (1) organization or participation in the sale of certain investment plans or arrangements; (2) statements by the defendant regarding the allowability of

---

[4] Defendant's request for a Court-ordered prison furlough to obtain such information was denied for these and other grounds. (ECF No. 234.)

deductions or tax credits, the excludability of income, or the securing of other tax benefits; (3) knowledge or reason to know that the statements are false; and (4) the statements which pertain to a material matter. See United States v. Benson, 561 F.3d 718, 721-22 (7th Cir. 2009); United States v. Gleason, 432 F.3d 678, 682 (6th Cir. 2005); United States v. Estate Pres. Servs., 202 F.3d 1093, 1098 (9th Cir. 2000); United States v. Campbell, 897 F.2d 1317, 1320 (5th Cir. 1990).

If each of the factors is satisfied, a district court may issue an injunction if it is "appropriate to prevent recurrence of such conduct." 26 U.S.C. § 7408(b)(2).

a.     Promote and Participate in Plan or Arrangement

The evidence establishes that Defendant participated in the sale of a plan or arrangement to shelter income from federal tax.

Defendant marketed to Drs. Bianco, Trierweiler, and Weaver (Bianco Dep. 5-20), CRNA Kryzko (UMF's 17, 19, 20), Dr. Hastings (UMF's 53-56), Dr. McKeag (UMF's 33-36), CRNA Geilenkirchen (UMF's 77-80, 85-90), and CRNA Snoozy (UMF's 100-103), his tax Plan using Nevada stock corporations (UMF's 9, 17, 25, 81) which had no underlying business purposes or undertakings (UMF's 28, 29) to take assignment of personal service income, off-set it with personal deductions, and then re-characterizing it as rents and royalties not subject to self-employment tax. (UMF's 34, 61-66, 87-90, 101-103, 131-132, 169-171.)

Defendant established Nevada stock corporations for Dr. Koning (UMF 121), including a corporation called Bioventures, which took assignment of Dr. Koning's personal service income from ACN. (UMF 124). Bioventures then took personal expense deductions, including costs of Dr. Koning's primary and secondary residences and

-41-

personal credit cards, as business deductions. (UMF 132).

Defendant, working with Dr. Koning, formed and marketed Arcturus (UMF's 3, 143, 147-148), a stock corporation whose purpose was to purchase interests in medical practices (UMF 140), in order to implement a financial restructure and avoid taxes. (UMF 142). Arcturus, consistent with Defendant's Plan, received untaxed personal service income and reimbursed it to the personal service provider as unreported and untaxed income. (UMF's 140-44, 160.)

Dr. Hasting participated in Arcturus, transferring un-taxed income (UMF 156), and then taking reimbursement without reporting same to the IRS. (UMF 157.) CRNA Snoozy participated in Arcturus in the same fashion. (UMF 147.) Defendant prepared the documents used by Hasting and Snoozy to participate in Arcturus. (UMF 148.) Defendant received a share of Arcturus earnings. (UMF 150.)

Defendant also utilized elements of his Plan in preparing returns for the Cooper's, the Teleses, and the Geilenkirchens, characterizing service income received by their corporate forms as paid out to them as rent and royalty income and not reportable wages (UMF's 161-176), and taking corporate deductions for personal expenses. (Id.)

Defendant paid Dr. Koning a referral fee. (UFM 114.) Defendant received fees from clients participating in his tax plan (UMF's 4, 32, 64, 91, 113), totaling $156,000 in 2002. (UMF 4.)

b.      Qualifying Statements by Defendant

The evidence establishes that Defendant made statements to his clients falsely attributing tax deduction, credit, income exclusion and tax benefits to his tax Plan.

Defendant told Drs. Trierweiler and Bianco they could aggressively deduct (UMF

-42-

7) cars, food, and trips as business expenses. (UMF 8.) He told Dr. Bianco his fee is based on tax savings from the Plan (UMF's 11, 84), and that Dr. Bianco would in effect save $6000/month in taxes. (UMF 12.) He told CRNA Kryzko she could use a stock corporation to deduct personal expenses (UMF's 17, 19), and pay as little as $3000 in taxes on income of $150,000 (UMF 20) and thereby save $20,000/year in taxes. (Id.) He told Dr. McKeag he could deduct all expenses except mortgage, food and clothing (UMF 30) and legally classify his unreported personal service income, net of deductions, as royalties. (UMF's 39, 43, 46.)

As to Arcturus, Defendant told CRNA Kryzko (who declined to participate) and Dr. Hastings, that Arcturus could legally buy and sell shares in professional providers and thereby provide tax benefits. (UMF's 146, 151.)

Defendant, in pursuit of his tax Plan told the Geilenkirchens that he was not going to file tax returns for them in 2003-2004 and that they would suffer no harm as a result. (UMF's 91-92.)

The foregoing is sufficient evidence to establish that Defendant directly addressed the availability of tax benefits and made false statements concerning factual matters relevant to the availability of tax benefits, United States v. Campbell, 897 F.2d 1317, 1320 (5th Cir. 1990), and thereby satisfied this prong of section 7408 liability.

c.       Knowledge or Reason to Know Statements False

The evidence establishes that Defendant knew or had reason to know his said statements were false.

A statement is false in the tax law context if "untrue and known to be untrue when made." U.S. v. Stover, 650 F.3d 1099, 1108, (8th Cir. 2011). The "knew or had reason to

know" standard [ ] includes what a reasonable person in the [defendant's] . . . subjective

position would have discovered." Estate Preservation Services, 202 F.3d at 1103. See

Campbell, 897 F.2d at 1322 ("[T]he reason to know standard allows imputation of

knowledge as long as it is commensurate with the level of comprehension required by

the speaker's role in the transaction.")

Defendant has a high level of sophistication, education and familiarity with tax

matters. (Pl. Mot. Summ. J., Ex. 29 at 2.) He holds a business degree from a major

university and practiced as a licenced CPA for over 20 years.

Defendant prepared returns for clients participating in his tax Plan, which he knew

or had reason to know were false. The McKeags, Ghyselinks, Hastings and

Geilenkirchens had returns prepared by Defendant which other accountants identified as

needing correction because of the involvement of invalid corporate entities and improper

characterization of income, deductions and taxes due. (UMF's 37, 41, 47-51, 64, 65, 69,

74, 91, 97, 99, 176.) Defendant repeatedly mis-stated taxpayer occupations on returns

he prepared in pursuit of his tax Plan. (UMF's 131, 169, 174-176.) His Nebraska clients,

employed full-time as health care providers, routinely had their occupation listed as

"investor" or "real estate". (Id.) Defendant repeatedly mis-characterized and left

unreported personal service income, assigning it to out-of-state stock corporations, off-

setting deductions, and reporting amounts reimbursed to the service providers as royalty

and rental income. (UMF 34, 61-66, 87-90, 101-103, 131-132, 169-171.) Defendant

repeatedly took business deductions on corporate returns for personal expenses.

(UMF's 8, 17, 19, 30, 31, 41, 46, 50, 65, 89, 132, 162, 164, 171, 175, 176.) Defendant

repeatedly filed IRS Forms 911, found to be false and without merit, and interrupting IRS

-44-

investigation of his clients. (UMF 183.)

Demonstrative of falsity of returns prepared by Defendant in pursuit of his Plan, the Konings, the Treirweilers, the Weavers, and the Snoozy's pleaded guilty to tax evasion based thereon, and paid restitution to the IRS. (UMF's 104-105, 107-109, 110-111, 136-138.) The Koning's alone paid restitution totaling $989,531 (UMF 138), reflecting the gravity of harm from Defendant's Plan and hence, arguably its obvious falsity.

Defendant's training and experience were such that it is not credible to believe that he did not appreciate the falsity of his said representations to his clients and the falsity of the claims in their tax returns which he prepared.

Courts have repeatedly held that a tax promoter's failure to advise his clients of the requirements for a proper deduction qualifies as a false statement. Stover, 650 F.3d at 1109, citing Gleason, 432 F.3d at 682–83 (tax protester's failure to "properly qualify" his assertions about the deductibility of everyday household expenses under § 162(a) amounted to "flagrantly false" statements); Estate Preservation Services, 202 F.3d at 1101 (scheme promoting deduction under I.R.C. § 162(a) which was merely a "camouflaged assignment of income" solely to gain a tax advantage was thus a false statement).

The California Board of Accountancy, the body regulating Defendant's CPA license, found Defendant's conduct relating to the Geilenkirchens 2002 corporate and individual returns to be fraudulent under the California Business and Professions Code, found that he failed to prepare and file their 2003 and 2004 returns, and revoked his

license.[5] (UMF's 185-186; Pl. Mot. Summ. J. Ex. 26 at 2-16.) For 2002, Defendant showed the Geilenkirchens paying federal taxes of $3789 on income of $176,000. (Pl. Mot. Summ. J. Ex . 26 at 9.)

Defendant's method of off-setting unreported service income with personal deductions, in the case of his own CPA sole proprietorship, has been determined by the United States Tax Court to be fraudulent, unfounded and improper, a "fantasy creation of petitioner in an effort to evade the payment of taxes due and owing."[6] (Pl. Ex. 29 at 3-5, 11-12.)

And of course Defendant has admitted his knowledge of the falsity of certain of his representations and his willful criminality in making them. He pleaded guilty to Count IV of a criminal Indictment which included charges that he wilfully attempted to evade and defeat taxes by concealing income, placing income and property in Dr. Koning's corporations, materially misrepresenting income and expenses on the Konings 2003 individual and corporate tax returns. <u>Baisden</u>, 4:09-cr-03031; ECF No. 283; UMF's 187, 188, 191. Defendant's guilty plea to Count IV is an admission of those said acts affirmatively constituting evasion of tax, <u>Sansone v. U.S.</u>, 380 U.S. 343, 351 (1965), and acts as collateral estoppel and a sufficient basis for entry of summary judgment in a subsequent civil case arising out of the same transaction and involving the same parties. <u>Ivers v. United States</u>, 581 F.2d 1362, 1367, (9th Cir. 1978).

The doctrine of res judicata bars ("collaterally estops") the re-litigation of claims previously decided on their merits in any subsequent action between the same parties.

---

[5] Cal. Bus. & Prof. Code § 5100.

[6] Defendant's returns before the Tax Court involved his sole proprietorship rather than a corporate form, but nonetheless involved Plan elements.

Headwaters, Inc. v. U.S. Forest Serv., 399 F.3d 1047, 1051–52 (9th Cir. 2005). The

elements necessary to establish res judicata are: (1) an identity of claims, (2) a final

judgment on the merits, and (3) identity or privity between parties. See Rest.2d

Judgments § 17; see also Adams v. California Dep't of Health Servs., 487 F.3d 684,

688–89 (9th Cir. 2007); Headwaters, Inc., 399 F.3d at 1052, quoting Tahoe–Sierra Pres.

Council, Inc. v. Tahoe Reg'l Planning Agency, 322 F.3d 1064, 1077 (9th Cir. 2003).

Defendant is collaterally estopped from denying that he wilfully evaded taxes by

concealing the Koning's 2003 income in the name of "nominee corporations" including

Arcturus and Bioventures, making false statements of income and expenses to the IRS,

and materially misrepresenting income and expenses on the Koning's Form 1040, as

alleged in County IV of the indictment. Indictment, U.S. v. Baisden, 4:09-cr-3031, Count

IV at 29.

Defendant's appeal of his criminal conviction does not avoid the effect of

collateral estoppel. It is well-established that a district court's judgment is a final

judgment for purposes of [collateral estoppel], even if an appeal is pending on that

judgment. See Robi v. Five Platters, Inc., 838 F.2d 318, 327 (9th Cir. 1988) ("[I]n federal

courts . . . the preclusive effects of a lower court judgment cannot be suspended simply

by taking an appeal that remains undecided.")

Defendant's citation to a 2007 press release ordered by Judge Wanger in

preliminary injunction proceedings then before him does not create a dispute of material

fact as to any issue here. Judge Wanger did not find that Defendant had not engaged in

a tax scheme or fraudulent promotion.[7]

The foregoing are sufficient evidence of that Defendant knew or had reason to know his above qualifying statements were false.

> d.      Statements Pertain to Material Matter

The evidence establishes that Defendant's statements pertained to material matters.

A matter is material if it would have a "substantial impact on the decision making process of a reasonably prudent investor." Stover, 650 F.3d at 1111, citing S.Rep. No. 97–494, at 267 (1982), as reprinted in 1982 U.S.C.C.A.N. 781, 1015; see also Benson, 561 F.3d at 724; Gleason, 432 F.3d at 683; United States v. Buttorff, 761 F.2d 1056, 1062 (5th Cir. 1985).

Defendant's misrepresentations to his clients pertained to reduction of taxable income by hundreds of thousands of dollars. (UMF's 37, 41, 47-51, 74, 107-109, 110-112, 176.) As such these representations certainly were and are material for financial statement purposes and would substantially impact the decision-making process of a reasonably prudent investor. See Gleason, 432 F.3d at 683 (abusive tax promoter's "exaggerations and misstatements" about his tax plan "undoubtedly influenced individuals deciding whether to purchase" them). Defendant's clients purchased his Plan after hearing Defendant's qualifying statements, (UMF's 7, 8, 11, 12, 17, 19, 20, 30, 39, 43, 46, 84, 146, 151), and presumptively were influenced by the statements.

The foregoing are sufficient evidence that Defendant's qualifying statements

---

[7] Judge Wanger ordered the U.S. Department of Justice to clarify that, in issuing the preliminary injunction, the Court "did not find . . . that Mr. Baisden had engaged in or promoted a tax scheme; [nor] did it find Mr. Baisden was engaged in a fraudulent tax promotion."

-48-

pertain to material matters.

e.   Injunction Necessary to Prevent Recurrence

The evidence satisfies the Court that an injunction is necessary to prevent recurrence of Defendant's proscribed conduct.

I.R.C. § 7408(b)(2) and applicable cases require a finding that "injunctive relief is appropriate to prevent recurrence of such conduct" based on the totality of the circumstances. Stover, 650 F.3d at 1112. The Ninth Circuit has set forth the following factors to be considered when weighing the likelihood of recurrence and therefore the necessity for an injunction under Section 7408, including: "(1) the gravity of the harm caused by the offense; (2) the extent of the defendant's participation; (3) the defendant's degree of scienter; (4) the isolated or recurrent nature of the infraction; (5) the defendant's recognition (or non-recognition) of his own culpability; and (6) the likelihood that defendant's occupation would place him in a position where future violations could be anticipated." Estate Preservation Services, 202 F.3d at 1105.

(1)   *Gravity of Harm*

As noted, the harm caused by Defendant's Plan is substantial and quite significant. He repeatedly used the Plan to understate federal taxes due. (UMF's 37, 41, 47-51, 64, 65, 69, 74, 91, 97, 99, 160, 174-176.) He advised clients not to file returns. (UMF's 69, 91-92), even where he had already been paid to file them. (UMF 70.) He failed to cooperate with the IRS and advised his clients do likewise. (UMF's 69, 134, 180-182.) He failed to represent the Geilenkirchens at their IRS audit of returns he prepared. (UMF 97). He missed related meetings with the IRS and failed to produce documents sought by the IRS in investigating the Plan. (UMF's 95-96.) Defendant's tax

-49-

Plan precipitated over a million dollars in tax loss to the government plus substantial

additional penalties paid by his clients, some of whom were criminally prosecuted.

(UMF's 37, 41, 47-51, 74, 107-109, 110-112, 161-176.)

(2)     *Defendant's Participation and (3) Scienter*

Defendant himself marketed and participated in the tax Plan, providing the tax

advice and preparing the returns. (UMF's 37, 41, 47-51, 131, 165, 169, 171, 173, 174,

176.) Indeed, it appears that he personally created the Plan elements which his clients

adopted only at his urging. From what is before the Court, it appears he was the single

most important moving force behind them. His participation in and knowledge of the tax

Plan, its implementation and consequences were substantial. For the reasons noted

above, including in particular his admission that he willfully undertook actions to evade

tax liabilities, the element of scienter is established.

(4)     *Recurrence*

As noted in the undisputed facts, Defendant promoted and perpetrated his plan

over several years and to and for many different individuals. This was not an isolated

occurrence, but rather a prolonged pattern of enjoinable activity.

(5)     *Acceptance of responsibility*

Despite having plead guilty to criminal acts in connection with his Plan and

despite having been debarred from practicing his profession in connection therewith,

Defendant continues to insist that he is innocent and his Plan legitimate. He has

maintained a website claiming the IRS has failed in attempts to enjoin his Plan (UMF

197) and denying that his Plan is abusive. (UMF's 184, 195) Clearly, Defendant does not

recognize his culpability in the Plan.

(6)   *Opportunity to continue*

Defendant's occupation, training and experience place him in a position where he can generate the opportunity to continue such violations in the future. Loss of his license may inhibit his ability to practice his profession in legitimate settings but will not prevent him from providing tax advice to individuals for a fee. Moreover, he can seek re-instatement of his California CPA license. Cal. Bus. & Prof. Code § 5115(a). Defendant's education, background, knowledge and experience in tax accounting, the sophistication of his Plan, its multi-state nature, and the opportunity for internet marketing thereof suggest likelihood of recurrence. Estate Preservation Services, 202 F.3d at 1105-06.

The foregoing considerations are sufficient to convince the Court that an injunction under section 7408 is necessary and appropriate to prevent Defendant from renewing his efforts to promote his Plan. When an injunction is explicitly authorized by statute, proper discretion usually requires its issuance if the prerequisites for the remedy have been demonstrated and the injunction would fulfill the legislative purpose." Stover, 650 F.3d at 1106, citing United States v. White, 769 F.2d 511, 515 (8th Cir. 1985). Plaintiff has satisfied the statutory requirements and demonstrated furtherance of the legislative purpose in proper administration of the tax laws. U.S. v. Bell, 238 F.Supp.2d 696, 704 (M.D.Pa. 2003).

In such circumstances, the traditional criteria for permanent injunctive relief need not be evaluated. See United States v. Landsberger, 692 F.2d 501, 503–04 (8th Cir. 1982) (affirming a permanent injunction under I.R.C. §§ 7402 and 7407 without discussing the criteria for a permanent injunction); See Benson, 561 F.3d at 724 (injunction necessary when defendant's conduct "was not isolated, but continuous," he

did "not acknowledge his culpability," and despite his assurances, he was "not likely to stop without an injunction"); Raymond, 228 F.3d at 814 (injunction necessary in part because of the government's significant loss and large administrative burden, the defendants' activities "were not an isolated instance of misconduct," and the defendants had not expressed remorse and had steadfastly maintained their total lack of culpability).

Under the circumstances, not no reasonable trier of fact could find other than in favor of Plaintiff. Defendant has not shown an absence of evidence to support I.R.C. § 7408 relief. In re Oracle Corp. Securities Litigation, 627 F.3d at 387.

Accordingly, it is recommended that Defendant be enjoined from organizing, promoting, and selling his tax Plan, and that Defendant receive express IRS approval before he organizes, promotes and/or sells any future tax method, scheme, plan, or arrangement of any kind, whatsoever. See Stover, 650 F.3d at 1112-13.

4.     I.R.C. § 7407 Injunction Against Preparation of Tax Returns for Others Should be Denied

Plaintiff seeks to permanently enjoin Defendant from preparing federal tax returns for others.

To obtain a permanent injunction prohibiting a defendant from acting as federal tax return preparer pursuant to I.R.C. § 7407, the government must establish that: (1) defendant engaged in conduct subject to penalty under I.R.C. § 6694 or I.R.C. § 6695 or "engaged in any other fraudulent or deceptive conduct which substantially interferes with the proper administration of the Internal Revenue laws"; (2) "injunctive relief is appropriate to prevent the recurrence of such conduct"; and (3) defendant "continually or repeatedly engaged" in the proscribed conduct such that a more limited injunction

prohibiting the misconduct "would not be sufficient to prevent such person's interference with the proper administration of this title [.]" U.S. v. McIntyre, 715 F.Supp.2d 1003, 1009, (C.D. Cal. 2010), citing I.R.C. § 7407(b); see also United States v. Kapp, 564 F.3d 1103, 1109 (9th Cir. 2009). I.R.C. § 6694 prohibits an income tax return preparer from (1) preparing a return containing an understatement of liability due to a position for which there is no realistic possibility of being sustained on the merits, (2) where he knows or should have known of the unrealistic position, and (3) fails to disclose the facts or basis for the position or the position is frivolous.[8] The "traditional requirements for equitable relief need not be satisfied" where a statute authorizes the issuance of an injunction and sets forth the requisite elements. Estate Pres. Servs., 202 F.3d at 1098. The government bears the burden of proving each element by a preponderance of the evidence. Kapp, 564 F.3d at 1109, citing Estate Pres. Servs., 202 F.3d at 1102.

The statute provides that only a defendant who has "continually or repeatedly engaged" in the prohibited conduct may be permanently enjoined from tax preparation for others. I.R.C. § 7407(b)(2). Courts have considered a variety of factors in analyzing this question, including but not limited to: (1) a defendant's willingness or refusal to acknowledge wrongdoing; (2) compliance with the law following a warning or notification by the IRS that the conduct is unlawful; (3) the percentage of tax returns filed which are fraudulent; (4) the severity of the harm, i.e. the amount of money fraudulently requested and the amount actually and erroneously released; (5) the number of discrete fraudulent practices; (6) the longevity of the fraudulent scheme; and (7) the defendant's degree of scienter. See, e.g., Nordbrock, 38 F.3d 440 at 446–47 (continual refusal to disclose

---

[8] Language in effect at times relevant. 103 Stat. 2402, 2404.

information to IRS warranted broader injunction prohibiting tax return preparation for others); United States v. Kyle, No. 07–cv–2187, 2008 WL 2745191, at *2–3 (S.D. Cal. July 11, 2008) (citing high percentage of audited tax returns which understated tax liability, multiple fraudulent practices, and $18 million in estimated tax loss in issuing broad injunction against tax return preparation for others); United States v. Sperl, No. 3:06–0175, 2008 WL 2699402, at *4, 8–9 (M.D. Tenn. June 30, 2008) (noting the high percentage of randomly audited returns with tax understatement and the willfulness of defendants' conduct); cf. United States v. Cruz, 618 F.Supp.2d 1372, 1391–92 (S.D. Fla. 2008), vacated in part on other grounds, U.S. v. Cruz, 611 F.3d 880 (11th Cir. 2010) (defendant's good faith efforts and government's delay justified targeted "first-instance injunction against prohibited conduct"). None of these factors is dispositive, but they have guided various courts in making this determination as to the scope of the permanent injunction." McIntyre, 715 F.Supp.2d at 1010.

The Court's analysis above shows that several of these factors militate in favor of issuing a permanent injunction in this case. However, not all do. Defendant's proscribed conduct has been almost exclusively in the course of implementing the Plan.[9] Although Defendant continues to deny the wrongfulness of his past acts, (UMF's 184, 195, 197), there is no evidence before the Court that he continued to actively use, market or otherwise promote the Plan after learning on October 26, 2004, (UMF 177), that it was the subject of an IRS investigation. The Plan appears to have spanned only a relatively small portion of Defendant's professional practice. See McIntyre, 715 F.Supp.2d at 1010 (C.D. Cal. 2010). There is no evidence that Defendant repeatedly engaged in other

---

[9] Defendant prepared returns for the Swartzes which included false business losses.

prohibited conduct unrelated to his abusive tax Plan. Cf., U.S. v. Pugh, 2010 WL

2266064 at *2-*9 (E.D.N.Y. June 1, 2010) (narrow injunction prohibiting only violation of

penalty provisions not appropriate where tax preparer "continually or repeatedly"

engaged in conduct subject to penalty; had reason to know that his activities were illegal

and, in fact, had engaged in a course of conduct to conceal his fraud; the fraudulent

activity had been pervasive and ongoing; and the preparer was aware of the wrongful

nature of his conduct, which was in violation of a preliminary injunction). The Court has

no information as to the number or percentage of returns prepared by Defendant

determined to be fraudulent.

The Court sees no need to preclude Defendant from earning a living by engaging

in the business of providing legitimate tax return assistance particularly where the

injunctive relief provided herein will afford protections to the public and the IRS from

perpetuation of the Plan or similar activity not pre-approved by the IRS. For these and all

all the other reasons set forth above, the Court finds that permanently enjoining

Defendant from preparing tax returns for others is not necessary or appropriate at this

time.

Accordingly, it is recommended that Plaintiff's Motion for Summary Judgment

enjoining Defendant under I.R.C. § 7407 from preparing tax returns for others be denied.

5.    I.R.C. § 7402 Injuction Against Power of Attorney Representation
      Should be Denied

Plaintiff seeks to permanently enjoin Defendant from appearing as a power of

attorney before the IRS because he has interfered with and delayed IRS investigations,

made false statements to IRS agents regarding examinations, failed to provide

requested records regarding the customers he represents, and failed to file required returns on customers' behalf.

I.R.C. § 7402(a) of the Internal Revenue Code gives the district courts of the United States the jurisdiction "to make and issue in civil actions, writs and orders of injunction . . . and to render such judgments and decrees as may be necessary or appropriate for the enforcement of the internal revenue laws." U.S. v. Music Masters, Ltd., 621 F.Supp. 1046, 1057) (D.C.N.C. 1985).

Once all of the facts have been proven showing a violation of section 6700 and showing that injunctive relief is appropriate, this Court is authorized, as a matter of law, to issue an appropriate injunction order. Traditional equity grounds need not be proven in order for an injunction that is authorized by statute to be issued. Buttorff, 761 F.2d at 1059; Donovan v. Brown Equipment & Service Tools, Inc., 666 F.2d 148, 157 (5th Cir. 1982).

For the same reasons discussed in the immediately preceding section of these Findings and Recommendations, the Court finds that Plaintiff has not demonstrated, and the equities do not dictate, a need for injunctive relief beyond that provided under 26 U.S.C. § 7408. As noted, Defendant's proscribed conduct appears to have been limited to his Plan. It does not appear that broader injunctive relief is necessary to prevent irreparable injury and avoid " . . . entangl[ing] the Government in a maze of lawsuits." United States v. Savoie, 594 F.Supp. 678, 683 (W.D.La. 1984). Injunctive relief under section 7402(a) of the Code is not, at the present time, necessary or appropriate.

Accordingly, it is recommended that Plaintiff's Motion for Summary Judgment enjoining Defendant under I.R.C. § 7402 from appearing as a power of attorney before

the IRS, be denied.

## IV.   DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### A.   Legal Standards

The applicable legal standards are set out in section III. A. above.

### B   Defendant's Position

#### 1.   Koning Joint Venture Not Fraudulent

Judge Wanger ruled in the preliminary injunction phase that Koning's corporate entity, Bioventures, had a valid business purpose. Judge Wanger found the Bioventures joint venture agreement then before the Court to be plausible and not a fraud. (Def. Mot. Summ. J. Exh. 1, Reporter's Transcript Mot. Prelim. Inj. at 377.)

Judge Wagner, during the preliminary injunction phase of this action, did not find Defendant engaged in or promoted a tax scheme or fraudulent tax promotion. (Def. Opp'n Mot. Summ. J., Ex. 1.)

#### 2.   Defendant Not a Tax Protestor

Judge Wanger, during the 2007 preliminary injunction proceedings, distinguished Plaintiff from a tax protestor. (Id.)

#### 3.   Defendant's Criminal Plea Based on Liars and Not Merits

Defendant pleaded guilty to Count IV only because he could not defend himself against compromised liars. The plea, according to Defendant, did not address the merits of the underlying tax issues.

#### 4.   Defendant's Criminal Case on Appeal

Defendant is appealing his felony conviction on grounds of ineffective assistance of counsel.

### 5.    Defendant Self-Surrendered for Incarceration

Defendant claims he was not arrested for violating pre-sentencing requirements as Plaintiff states, but rather that he self-surrendered as reflected in the Taft CI Sentencing Monitoring Report.

### 6.    Plaintiff's Opposition Late

Defendant argues Plaintiff's Opposition to his Motion for Summary Judgment was due by August 30, 2012, but not served and filed until September 7, 2012. Local Rule 230(l). Defendant requests Plaintiff's late Opposition be disregarded.

### C.    **Plaintiff's Position**

#### 1.    Defendant Provides No Separate Statement

Plaintiff claims Defendant has failed to provide a supporting statement of undisputed facts as required by Local Rule 260 and his Motion should be denied on that basis.

#### 2.    No Absence of Evidence Supporting Plaintiff's Case

Plaintiff claims Defendant has failed to demonstrate his Plan does not use stock corporations and false statements to evade tax and claim unlawful deductions. Defendant fails to raise any issue of disputed fact in this regard.

Judge Wanger, in his Findings of Fact and Conclusions of Law supporting issuance of the Preliminary Injunction, found Defendant had engaged in conduct likely to violate 26 U.S.C. § 6700 and in so doing provided inaccurate tax advice. (Order Clarifying and Modifying Findings of Fact, ECF No. 102 at ¶ 3.) In any event, findings upon issuance of a preliminary injunction are not binding at trial on the merits. University of Texas v. Camenisch, 451 U.S. 390, 395 (1981).

Defendant and his client and co-conspirator Koning both pleaded guilty to felony tax evasion for their roles in Bioventure. Defendant is collaterally estopped from arguing these returns he prepared and the advice he provided were legitimate, and from challenging the factual basis for his guilty plea.

Defendant continues to blame others, denying responsibility for his actions. A permanent injunction is necessary to prevent recurrence.

### 3.   Defendant's Tax Protestor Status Irrelevant

Plaintiff does not dispute Judge Wanger found Defendant not to be a tax protestor. However, Plaintiff submits that point is irrelevant under the statutes at issue in this case, I.R.C. §§ 7402, 7407, and 7408.

### 4.   Defendant's Criminal Appeal Irrelevant

Plaintiff claims Defendant's appeal of his conviction, and grounds therefor, are immaterial to the Motions before the Court and not a basis for summary judgment in Defendant's favor.

### 5.   Self-Surrender

Regardless of whether Defendant self-surrendered on February 28, 2012, he was arrested on February 6, 2012 to prevent him from fleeing the county. This is sufficient to suggest Defendant can not be trusted, and that a permanent injunction is needed.

**D.   Discussion**

Defendant seeks a finding on summary judgment that his tax method is not abusive and that he not be barred from tax preparation.

Aside from the fact that such a finding would be inconsistent in part with this Court's other findings on the cross-motion herein, Defendant's Motion is procedurally

deficient. He fails to provide the required separate statement of facts. Fed. R. Civ. P. 56(c); Local Rule 260. Local rules relating to separate statements have the force of law and summary judgment may be upheld based on a party's failure to comply therewith. Huey v. United Parcel Service, Inc., 165 F.3d 1084-85 (7th Cir. 1999). His failure is prejudicial to the Plaintiff in that it leaves Plaintiff uncertain as to what facts are in issue and what, if any, evidence supports them. This defect is not remedied by Defendant's opposition to the cross-motion for the reasons discussed above. Defendant has not demonstrated, in the manner required by Rule 56, that his tax Plan is not abusive. Defendant's Motion for Summary Judgment should be denied on this basis.

Defendant cites to proceeding and rulings issued in the preliminary injunction phase of this action. The Court, in ruling on the instant Rule 56 Motions, is not limited to the record on preliminary injunction or bound thereby. University of Texas, 451 U.S. at 395. Regardless, nothing proffered by Defendant and before the Court suggests Judge Wanger, who presided over the preliminary injunction phase, ruled that Defendant's tax Plan was not abusive. Mere argument proffered by Defendant in his memorandum opposing preliminary injunction is not evidence for purposes of Rule 56. See Coverdell v. Dep't of Soc. & Health Servs., 834 F.2d 758, 762 (9th Cir. 1987) (recitation of unsworn facts not evidence). Similarly, whether Defendant is a "tax protester" or not and whether Judge Wanger characterized him one way or the other is not material to this Motion.

Defendant disputes the effect here of the judgment against him in his criminal case. He has not however presented anything to suggest that the conviction is ineffective, inadmissible here or not determinative of his guilt to the charge to which he pleaded.

Defendant argues Plaintiff's Opposition to his Rule 56 Motion was late. While Defendant is correct, there is no indication he was prejudiced as a result. Defendant's request that Plaintiff's late Opposition be stricken is denied on that basis.

The Court would in any event consider evidence submitted by Plaintiff in support of its cross-motion in determining whether there is a triable issue of fact even if Plaintiff's opposition were stricken. Fair Housing Council of Riverside County, Inc., v. Riverside Two, 249 F.3d 1132, 1136 (9th Cir. 2001). Plaintiff has carried its burden on the cross-motion.

Accordingly, it is recommended that Defendant's Motion for Summary Judgment be denied as procedurally and substantively deficient.

## V.    LEGAL CONCLUSIONS AND RECOMMENDATIONS

### A.    Legal Conclusions

Defendant's Motion to Strike Plaintiff's Motion for Summary Judgment is unsupported by facts showing good cause for such relief and should be denied.

Defendant's Motion for Summary Judgment is deficient procedurally and substantially and should be denied.

Under 26 U.S.C. § 7408, the Court is authorized to issue an injunction barring any person from engaging in any conduct subject to penalty under 26 U.S.C. §§ 6700 or 6701.

Defendant violated § 7408 by organizing, promoting and selling his tax Plan involving assignment of taxable income to stock corporations and then claiming offsetting royalties, rents and personal deductions to evade federal tax; and by making knowingly false statements of tax deduction, credit, income exclusion and tax benefits

relating to material matters, subject to penalty under 26 U.S.C. §§ 6700 and 6701.

For the reasons stated, this conduct unless enjoined is likely to recur, and a permanent injunction is necessary to prevent such recurrence.

Enjoining Defendant from preparing tax returns for others, and from appearing as a power of attorney before the IRS, is not at present necessary or appropriate to prevent Defendant from interfering with the proper administration of the I.R.C.

**B.** **Recommendations**

Accordingly, for the reasons set forth herein, the undersigned RECOMMENDS that:

1. Defendant's Motion to Strike (ECF No. 220) be DENIED;

2. Defendant's Motion for Summary Judgment (ECF No. 217) be DENIED;

3. Plaintiff's Motion for Summary Judgment (ECF No. 209) be GRANTED IN PART and, pursuant to I.R.C. § 7408, Defendant, his agents, servants, employees, attorneys, and all persons in active concert or participation with him, be  permanently enjoined from directly or indirectly, advising, promoting, facilitating, or participating in:

    (a)   the Plan, as defined above and here as making representations about federal tax benefits or a tax treatment which Defendant knows or has reason to know are materially false and fraudulent and based thereon (1) organizing, promoting, and participating in a scheme whereunder individual personal service providers assign or invest income with wholly owned corporations, (2) claiming on the corporations' returns unlawful deductions for non-deductible

-62-

personal expenses, (3) reporting the remaining income to the

individual personal service providers as rental or royalty income, (4)

not reporting the corporation's payments of the service providers'

personal expenses as constructive dividends for which taxes are

due, and (5) not reporting self-employment or social security tax

liability on the personal service income mis-classified as rental or

royalty income,

(b)    any investment, business venture, or other plan or arrangement

making false or fraudulent representations about federal tax benefits

or treatment,

(c)    any other activity subject to penalty under I.R.C. §§ 6700 and 6701,

or any other penalty provision in the Internal Revenue Code,

(d)    causing other persons or entities to understate their federal tax

liabilities and avoid paying federal taxes,

(e)    any other activity subject to penalty under I.R.C. §§ 6694 and 6695,

(f)    any other conduct that interferes with the administration or

enforcement of the internal revenue laws,

(g)    any future tax method, scheme, plan, or arrangement of any kind,

whatsover, without express IRS approval;

4.    Plaintiff's Motion for Summary Judgment (ECF No. 209) be DENIED in all

other respects other than as provided in paragraph 3 of this

Recommendation;

5.    Plaintiff may conduct post-judgment discovery to monitor Defendant's

-63-

compliance with the terms of this injunction.

These Findings and Recommendations will be submitted to the United States District Judge assigned to the case, pursuant to the provisions of Title 28 U.S.C. § 636(b)(l). Within fourteen (14) days after issuance of these Findings and Recommendations, the parties may file written objections with the Court. The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." A party may respond to another party's objections by filing a response within fourteen (14) days after being served with a copy of that party's objections. The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

Dated:    March 25, 2013             /s/ *Michael J. Seng*
                              UNITED STATES MAGISTRATE JUDGE

-64-